Whitaker, Judge,
delivered the opinion of the court:
The plaintiff sues the defendant on twelve different claims, as set out in the findings of fact. These claims will be discussed in order.
CLAIM NO. 1.-ADDITIONAL COST POR CONCRETE PORMS IN DAM ON ACCOUNT OP ALLEGED CHANGES IN CONTRACT DRAWINGS
Plaintiff sues for the cost of the additional concrete forms necessitated by the installation in the dam of chain storage recesses, and recesses for a pick-up device.
The defendant defends first on the ground that plaintiff did not protest at the time it was required to put in the chain storage recesses and the recesses for the pick-up device, as required by the contract. It is true that the contract required that any claim for adjustment for a change made should be asserted within ten days from the date the change was ordered, “unless the contracting officer shall for proper cause extend such time”; but, although no protest was made, the contracting officer considered on its merits this claim set out in plaintiff’s letter of May 28, 1931. The provision requiring protest within ten days was a provision inserted for the benefit of the defendant and, of course, could be waived by it. The consideration of the claim on the merits, without any mention of the fact that it had been filed too late, was a waiver of this contract provision. Thompson v. United States, 91 C. Cls. 166, 179; Callahan Construction Company v. United States, 91 C. Cls. 538, 610.
The defendant says that our decision in Johnson v. United States, 94 C. Cls. 175, 202, is in conflict with th'e foregoing decisions and states the correct rule. It is true that in the Johnson case, as in the Thompson and Callahan Construction Company cases, the contracting officer and the head of the department did hear the plaintiff’s claims, although there had been no timely protest, but the opinion in the Johnson case states they did so without waiving the failure to protest. On the other hand, in the Thompson and Callahan Construction Company cases *111 there was a consideration of the claims on the merits without any reservation of the right to rely on the failure to protest. From this we held that a waiver was to be implied; but, of course, a waiver cannot be implied if there is an express statement that the provision for protest is not being waived, or if there are other facts in the case to rebut the implication of a waiver arising from the consideration of the claims on the merits. In the Johnson case we concluded there were present facts which we thought rebutted this implication.
In the case at bar the contracting officer considered the claim on its merits without any mention of the fact that the protest had not been filed as required by the contract. There was no indication that he was relying on this provision of the contract. His action in considering the claim on the merits without any mention of this provision of the contract is a clear indication that he did not intend to rely on it, but waived it.
The drawings, referred to in this case as “plates”, called for chain storage recesses and for recesses for a pick-up device. Plaintiff knew that it would be necessary for it to provide for these recesses, and with this knowledge it put in its bid for doing the work, although specifications for the recesses were not furnished. The specifications furnished later were such as plaintiff could reasonably have expected when it put in its bid. The recesses were called for by the contract and were not an addition thereto. The Chief of Engineers, therefore, correctly ruled that plaintiff was not entitled to additional compensation therefor.
On the other hand, the control rooms and the bearing plate recesses were not called for by the original contract and, therefore, the Chief of Engineers allowed plaintiff additional compensation for their installation.
It results that plaintiff is not entitled to recover on this claim.
CLAIM NO. 2-TIMBER PILE CTJT-OEES
On this claim the plaintiff sues for $1,312.50 for 9,722.22 linear feet of piling cut off above the prescribed elevation, in addition to the amount allowed. The amount of 5,911.22 linear feet of the 9,722.22 linear feet was cut off *112 in the storage yard before the piles were placed in the pile driver leads; the balance represents 1 foot on each of the 3,811 piles driven which was cut off on account of brooming, for which no payment was made.
As he was authorized to do by the specifications, the contracting officer on April 25,1935 prescribed that certain piles should be driven to a depth of 30 feet below the cut-off elevation, and certain others to a depth of 20 feet below the cutoff elevation, subject to change as provided for in section 4-03 (a) of the specifications, which provided in part:
* * * where driving conditions clearly indicate that piles of lengths directed cannot be satisfactorily driven shorter lengths may be furnished by mutual agreement between the contractor and the contracting officer.
When the piles were actually driven it was found that they could not be driven to the length specified by the contracting officer; whereupon, the contracting officer and plaintiff’s project manager agreed that the defendant’s resident engineer should be authorized to prescribe from time to time the depth to which the piles should be driven, and that the plaintiff should be paid for the lengths designated by the resident engineer. The plaintiff continued under this arrangement until June 8, 1935, at which time only 700 of the total of 3,811 piles remained to be driven, when the contracting officer wrote plaintiff specifying the depths to which the remaining piles should be driven, subject to change- as provided for in section N03 (a), quoted above..
Piles were placed in the pile driver leads in .accordance with the lengths designated-from time to time by the resident engineer. The defendant kept a record of these lengths, the accuracy of which the plaintiff does not dispute, and plaintiff has been paid on the basis of these lengths at the contract rate of 27 cents per linear foot driven below the cut-off elevation, and 13.5 cents per linear foot above the cut-off elevation, less 1 foot cut-off on account of brooming. The plaintiff claims, in addition, the number of feet cut off in its storage yard before the piles were placed in the pile driver leads and, in addition, for the 1 foot cut off for brooming.
*113 So far as plaintiff’s claim for the amount cut off in the storage yard is concerned, it seems plain to us that it is not entitled to recover, in view of the agreement between the parties that the resident engineer should designate the depth to which the piles were to be driven, and that the plaintiff should be paid on the basis of these lengths. The length of the piles placed in the pile driver leads was in accordance with the depth to which they should have been driven as prescribed by the resident engineer. The contract provided that where piles of certain lengths had been placed in the pile driver leads and it was found that they could not be driven to the depth specified, the plaintiff should be paid for them at 27 cents a linear foot below the cut-off elevation, and 13.5 cents per linear foot above the cut-off elevation. The plaintiff was paid in exact accordance therewith, except that the defendant did not pay for the 1 foot which it was necessary to cut off on account of brooming.
We are of opinion also that the plaintiff is not entitled to be paid for this 1 foot cut off for brooming. The contract provided that the piles should be driven to the specified depth “without injury to the pile,” and it also provided that “after driving, all piles shall be cut off square at the elevation shown on the drawings.” The force of the pile driver on the pile caused the top of it to splinter. This is called brooming. In order to comply with the specifications that the piles should not be injured and should be cut off square at the elevation shown, it was necessary to cut off the part of it that had broomed. The proof shows that about 1 foot of a pile driven to the depth these piles were driven will broom. This is the amount deducted by the defendant from the lengths of the piles placed into the pile driver leads.
The plaintiff is not entitled to recover on this claim.
CLAIM NO. 3.-ADDITIONAL COST OF EXPANSION AND CONTRACTION JOINTS IN LOCK
Plaintiff sues for the sum of $1,726.18, the cost of installing expansion and contraction joints between the vertical joints of the monoliths of concrete in the lock walls.
*114 Before placing these monoliths plaintiff prepared a monolith layout plan for the lock walls, which was approved by the contracting officer on June 3, 1935. At this time the question was raised as to whether or not the joints between the monoliths should be ordinary joints or expansion and contraction joints. The contracting officer ruled that they should be expansion and contraction joints, but since such joints were not shown by the plans and specifications, he issued a change order providing therefor, and providing that the plaintiff should be paid therefor the sum of $1,765.00. This was accepted by the plaintiff.
However, because the cost was more than $500.00, it was necessary for this change order to be submitted to the head of the department. When so submitted, the head of the department ruled that it was “customary and desirable” that expansion joints be used and, therefore, that the plaintiff was not entitled to compensation therefor. He did not rule that these expansion joints were provided for by the plans and specifications. He ruled merely that they were “customary and desirable.”
The contract did not call for these expansion joints at these places and his requirement that plaintiff install them was a requirement outside of the contract, for the cost of which plaintiff is entitled to be paid.
The defendant does not defend here on the ground that these joints were called for by the contract. It merely says, as did the Chief of Engineers, that they were customary and desirable, but whether or not they were customary and desirable is entirely immaterial. The material inquiry is whether or not they were called for by the contract. It is admitted that they were not.
The defendant also defends on the ground that no appeal was taken to the head of the department. This defense is not good. It was the head of the department who had made the ruling of which plaintiff complains and, therefore, the provision for an appeal to him from a ruling of the contracting officer has no application. Plaintiff protested against his action; it did not acquiesce therein; and finally, when the work was completed, it again presented its claim to the contracting officer and the head of the department; it was considered by them, and was again denied.
*115 The plaintiff has sufficiently complied with all provisions of the contract. It is, therefore, entitled to recover the sum of $1,726.18 on this claim.
CLAIM NO. 4. — REPAIRS TO LOOK CONCRETE
Plaintiff sues for $229.49, the cost of repairing a portion of the concrete in monolith L-6-B which was honeycombed. There is some controversy between the parties as to the cause of the honeycombing, the plaintiff contending that the mix specified by the defendant was too dry, and the defendant insisting that it was caused by a failure of the plaintiff to properly vibrate the concrete.
However this may be, the proof shows without controversy that the plaintiff made the repairs required without any protest, and made no claim for extra compensation therefor until the conclusion of the work on May 28, 1987, nearly two years after this work had been done. It was plainly an afterthought. In addition, other concrete poured of the same mix did not honeycomb, and plaintiff’s claim, therefore, that the fault was due to improper specifications is not sustained.
For these reasons we are of opinion that plaintiff is not entitled to recover on this claim.
CLAIM NO. 5-FLOOD DAMAGE TO FIRST COFFERDAM FOR THE DAM
On January 3, 1936, there was a flood in the Savannah River. At this time the plaintiff had completely constructed the first six cells of the cofferdam for the first section of the dam, and the seventh one had been completed, except that it was only three-fourths full of dirt. The flood scoured out the bed of the river underneath the fifth, sixth, and seventh cells, and damaged the cell walls to such an extent that they had to be removed and replaced. It also damaged to some extent cell No. 4. The plaintiff asks compensation therefor alleging: (1) that it is entitled to an equitable adjustment under articles 3 and 4 of the contract on account of changed conditions materially different from those set forth in the plans and specifications; and (2) that the damage was caused by the refusal of the defendant to permit the opening of the gates to the lock.
Plaintiff’s first position is plainly untenable. Article 4 *116 provides: “Should the contractor encounter, or the Government discover during the progress of the work, subsurface and (or) latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, the attention of the contracting officer shall be called” thereto and the drawings and specifications changed; and if any increase or decrease of the cost results therefrom it shall be equitably adjusted.
At the time cells 4, 5, 6, and 7 had been constructed the bed of the river was no different from what it was when the plans and specifications were drawn. The later change was brought about by an act of nature during the progress of the work. This provision of the contract refers to a latent condition existing at the time the contract was entered into, not to one occurring thereafter. The condition of the bed of the river until the flood was the same as that it had been represented to be before the contract was signed.
The damage resulted from an act of God. The defendant was in no way responsible therefor, unless its failure to permit the gates of the lock to be opened contributed to the damage. If so, and if it was its duty under the circumstances to permit the gates of the lock to be opened, the defendant should respond in damages.
From a reading of the record we are convinced that the failure to open the gates did contribute to the damage. It is true that defendant’s resident engineer expressed the opinion that the damage would have resulted whether or not the gates had been opened, but we cannot agree that this is so. The width of the river, normally 460 feet, had been reduced to 160 feet between the lock on the Georgia side of the river and cell No. 7 on the South Carolina side. The width of the lock was 66 feet. If these gates had been opened, the space within which the water could have flowed would have been increased from 160 feet to 216 feet after the river had risen to a stage of 101 feet, the lower level of the upstream gate sill of the lock. This necessarily would have decreased the velocity at any one point. Although the proof shows that there would have been some scouring even with the gates of the lock open, nevertheless, it stands to reason that there would have been less scour had the gates been opened, because there would have been less *117 velocity. Certainly, failure of the defendant to open the gates did contribute to the damage.
But the defendant says that it was justified in refusing to open the gates. Sometime prior to the flood and in anticipation of a possible flood, the plaintiff had requested permission to open these gates in case a flood should occur. The contracting officer told the plaintiff he would not permit the gates to be opened until the bank below the locks had been protected from erosion, because of the danger of undermining the land wall of the lock. At the time of the flood the plaintiff had not completed the protection of this bank. It was exposed at a point which in the judgment of the contracting officer was a critical point, the erosion of which might have undermined the land wall of the lock.
On the morning of January 2, 1986, when the flood was imminent, the resident engineer called the contracting officer transmitting plaintiff’s request that the gates be opened, and informing the contracting officer that these critical points had not yet been protected by the plaintiff. The contracting officer replied that he would give the matter consideration. Shortly thereafter during the day he called the resident engineer and informed him that he was sending a man down to investigate the condition. By the time this man arrived at noon on the day following the plaintiff had protected the bank at these critical points and permission was given to'open the gates. When it undertook to do so, the pressure of the water was so great that they could not do so with the equipment at hand, and the gates were never opened.
It was the duty of the contracting officer to protect the work that had been completed and paid for in part. He was required to permit no act to be done which reasonably might result in damage to it.
Plaintiff had ample opportunity to properly protect the bank, but had chosen to do other work instead. The condition which, in the opinion of the contracting officer, made it dangerous to open the gates was a condition which plaintiff could have prevented. Having been forewarned by the contracting officer that permission would not be given to open these gates until this condition was remedied, plaintiff cannot complain that permission was refused.
*118 Moreover, tbe specifications required the plaintiff to berm with stone each cofferdam “wherever scour from flowing water or eddy water is likely to occur.” Plaintiff had not done this, and the proof shows that had these cells of the cofferdam been bermed with stone, the damage, if not prevented, would have been greatly minimized.
Moreover, the plaintiff had left a large pile of dirt in the bed of the river next to the river wall of the lock which it should have removed. This dirt obstructed the flow of the river and, therefore, increased the velocity of it toward the cofferdam across the river.
The scouring was caused by an act of nature, for which, of course, the defendant was in no way responsible, and which could have been prevented had the plaintiff done three things which it was required to do: (1) had it bermed the cells of the cofferdam, as required; (2) had it removed the pile of dirt from the river as it was required to do and had been ordered to do; and (3) had it protected the bank of the river below the land wall of the lock so the gates could have been opened.
The plaintiff is not entitled to recover on this claim.
OLAIM: NO. 6.-ADDITIONAL PAYMENT FOR FLOODING OF THE COFFERDAM DURING PERIOD FROM MARCH 25, 1936, TO APRIL 16, 1936
On this claim plaintiff sues for $2,500 on the ground that between March 25, 1936, and April 16, 1936, there were two floods, when the stage of the river reached 115 feet and that, therefore, under the specifications it is entitled to two payments of $2,500 each. The specifications provide for a payment of $2,500 whenever the river reaches an elevation of 115 feet. The stages of the river during these dates are set out in the findings. They show that on March 25, 1936 the river reached a stage of 115 feet and continued at this height or above until 11:00 a. m. on March 31, 1936, when it receded to 114 feet, at which time plaintiff resumed operations. Operations were continued until 11:00 p. m. on April 1,1936, when the work was stopped on account of another rise in the river. On April 2,1936, the stage again reached 115 feet, and continued at this stage or above until April 16,1936.
*119 Paragraph 1-06 of the specifications provides for a payment of $2,500 for a stoppage in the work on account of a flood, to be paid “ upon full resumption of the work on the lock and/or dam.” We are of opinion that plaintiff is entitled to only one payment of $2,500, which has been paid, for the high water existing between March 25, 1936 and April 16, 1936, by reason of the provision that this amount is to be paid “upon full resumption of the work on the lock and/or dam.” While on March 31, 1936, plaintiff had resumed some of the work on the dam, it had not resumed all of the work. The proof shows that it had begun pumping the water out of the cofferdam, and by the time of the second flood had reduced the level of it from 113 feet to 90.9 feet. It also had resumed installation of the pump sumps, but it had not resumed operations with the dragline. When work was stopped again, it was in the process of cleaning and repairing this dragline, but had not yet gotten it in condition to resume operations with it. Since the specifications provided for the payment of $2,500 “upon full resumption of the work,” and since the work was not fully resumed on March 31, and not until April 16, plaintiff is entitled to recover only one payment of $2,500.
It is true that the second rise deprived plaintiff of the advantage of the 22 feet of water which had been pumped from the cofferdam in the interim, and of the work it had done in cleaning and otherwise reconditioning the drag-line, but there is no provision of the specifications providing for payment therefor. In the absence of a provision providing for such payment, it must be held that this was one of the risks assumed by the plaintiff in the doing of the work.
The amount of $2,500 having already been paid plaintiff on account of the high waters from March 25, 1936 to April 16, 1936, it is not entitled to recover anything more on this claim,
CLAIM NO. 7.-ADDITIONAL COST OK PERMANENT SHEET STEEL PILING CUT-OEF WALL UNDER DAM
On this claim the plaintiff sues for $1,455.90, the cost to it of using piling 34 feet long, instead of 17 feet long, *120 in constructing tbe cut-off wall between the cofferdams for the first and second sections of the dam. The necessity for the use of the longer piling was the scouring of the river, discussed under claim 5. For this scouring we have held the defendant was not responsible.
Besides, article 5 of the contract provides:
Except as otherwise herein provided, no charge for any extra work or material will be allowed unless the same has been ordered in writing by the contracting officer and the price stated in such order.
The extra length piling was not ordered in writing by the contracting officer. Plaintiff installed it on its own initiative, without claiming any extra compensation for it at the time, and not until the conclusion of the work, when it wrote the contracting officer its letter of May 28, 1937 setting out its various claims for additional compensation. This claim was denied by the Chief of Engineers, and his action is plainly correct.
CLAIM NO. 8. — FLOOD DAMAGE TO SECOND COFFERDAM FOR THE DAM
Plaintiff sues for $5,477.30 for the cost of reconstructing cell B in the cofferdam for the second section of the dam. The proof shows that during a certain rise in the river the elevation of the water outside of the cofferdam was increased to 25 feet above that in the dam. This caused cell B to collapse. There is no showing that the defendant was in anywise responsible therefor.
Plaintiff contends that the defendant should have provided for a belt of riprap upstream from the concrete structure to prevent the water from sucking out the material underneath the cofferdam. Whether or not this is so, the plaintiff entered upon and continued the work knowing that no such riprap had been constructed, and it made no protest against it.
Moreover, plaintiff reconstructed the cell on its own initiative and without making any claim for extra compensation at the time, and without furnishing the defendant with the costs thereof while it was being reconstructed, as it was required to do. Its first claim on this account was asserted *121 after its work had been completed, in its letter of May 28, 1937, heretofore referred to.
The plaintiff is not entitled to recover on this claim.
CLAIM NO. 9.-COST OF ADDITIONAL CEMENT USED IN CONCRETE
The plaintiff sues to recover the value of the cement it was required to incorporate in the concrete which was in excess of that specified by the specifications. The specific cations provided for 4.5 bags of cement to each cubic yard of concrete. From June 24, 1935 to August 8, 1935 plaintiff was required to put 4.7 bags of cement in every cubic yard of concrete, instead of 4.5 bags as specified, and thereafter it was required to put 5 bags of cement in every cubic yard of concrete.
Paragraph 5-13 (b) of the specifications provides:
The exact proportions of all materials entering into the concrete shall be as directed by the contracting officer. The contractor shall provide all equipment necessary to positively determine and control the actual amounts of all materials entering into the concrete. The proportions will be changed whenver in the opinion of the. contracting officer such change becomes necessary to obtain the specified strength and the desired density, uniformity and workability, and the contractor will not be compensated because of such changes.
Acting under the authority thereby conferred, the contracting officer first required the plaintiff to use 4.7 bags of cement per cubic yard, instead of 4.5 bags. This was necessitated, in his judgment, by the character of the coarse aggregate used by the plaintiff in the mix.
The plaintiff continued to use this amount of concrete from June 24, 1935 to August 8,- 1935. On the latter date the contracting officer made an inspection of the work and found that a portion of the face of one of the monoliths was honeycombed and, therefore, determined that it would be necessary to use 5 bags of cement in order to get proper workability of the concrete. When the plaintiff protested against such verbal instruction, the contracting officer wrote it the next day directing it in writing to use 5 bags of cement per cubic yard, unless the plaintiff corrected the condition by doing one of two other things: either by using “more *122 suitably graded aggregates, or by the addition of p'ozzuo-lanic material.” The plaintiff preferred to adopt neither of these alternatives, and continued to use 5 bags of cement in every cubic yard of concrete. It did this without making further protest and without taking an appeal to the head of the department, as provided for in the contract.
Authority was plainly conferred on the contracting officer to prescribe the ingredients for the concrete, and his action in prescribing 5 bags of cement does not appear to be unreasonable. On the contrary, it would appear that he undertook to be as fair as possible with the plaintiff by giving it the option either of using more suitably graded aggregates, or by adding pozzuolanic material to the mix. Plaintiff did not choose to do either one, but apparently preferred to use the additional amount of cement required.
In addition, plaintiff failed to take an appeal to the head of the department within the time required, as required by the contract, and for this additional reason it is not entitled to recover.
CLAIM NO. 10. — ADDITIONAL COST IN MAKING FILL UPSTREAM. FROM DAM
Plaintiff sues for the sum. of $445.79, the excess of the cost of the partial construction of a berm on the upstream edge of the dam above the amount paid it.
The construction of this dam was provided for by change order No. 20, paragraph (a) of which is quoted in finding 80.
The plaintiff was paid for the amount of material deposited. This is not disputed by the plaintiff; its claim is grounded on the fact that since a portion of the material which it placed in the berm was washed away by the current, and since it was paid only for that part which remained in place, it is entitled to recover under paragraph 1-12 of the specifications, instead of under the provision of the change order.
Paragraph 1-12 of the specifications plainly has no applition. This relates only to such extra work as is not covered by articles 3 and 4 of the contract. This work was covered by article 3 of the contract. The change was ordered in writing by the contracting officer as provided for in this *123 article. Plaintiff has been paid on the basis of the agreement contained in change order No. 20 and is not entitled to additional compensation, notwithstanding the fact that the work cost it more than it has been paid.
CLAIM NO. 11. — ADDITIONAL COST OP REHANDLING RIPRAP STONE UNDER CHANGE ORDER NO. 20
This claim is for the extra cost of handling twice the stone necessary to sink and anchor the mattress upon which the plaintiff was required by change order No. 20 to place riprap. It appears that the plaintiff was directed by the resident engineer to have available 8 carloads of stone not later than December 28, 1936 for the purpose of sinking and anchoring this mattress. No stone arrived until December 31, 1936, when the plaintiff received 6 carloads. The defendant had a force of men available on that date to sink the mattress, but it was not requested so to do by the plaintiff. The New Year’s holiday began on noon of that date, and extended through January 3, 1937, during which time no work was performed, nor was any requested of the defendant by the plaintiff. In the meantime a rise in the river prevented the work’s being done, and it was not done until January 15, 1937. This made it necessary for the plaintiff to unload the stone from the cars onto the ground, and then later load it onto the barges. For this extra work for twice handling the stone it makes this claim.
It is plain that it is not entitled to recover. In the first place, the plaintiff did not deliver the stone at the time required. When it did deliver it, an oncoming holiday interfered with the immediate placing of the stone on the mattress. A rise in the river occurred in the meantime, necessitating the handling of the stone twice. The necessity for so doing clearly was not the fault of the defendant, and plaintiff, therefore, is not entitled to recover.
CLAIM NO. 12. — ADDITION AL COST OP REPAVING ESPLANADE OF LOCK
The plaintiff asserts claim for the sum of $537.22, the cost of removing and replacing a portion of the esplanade between the land wall of the lock and the natural bank of *124 the river, which had been damaged by a settling of the earth in the fill which had been constructed by the plaintiff.
Plaintiff is not entitled to recover. The fill had been constructed by the hydraulic process, leaving the top of it uneven. It was smoothed off by a dragline. Before the concrete could be placed, all of the material, including that disturbed by the dragline, had to thoroughly settle. Plaintiff’s project manager and the resident engineer agreed that it should be settled by running water thereon from a hose until such time as the resident engineer should determine it had thoroughly settled. Before he had given his approval therefor, the plaintiff began the paving, although the resident engineer advised it that this could be done only on its own responsibility. The plaintiff assumed the risk of the fill’s settling. It did settle, as a result of which the paving was damaged. Plaintiff, therefore, is not entitled to recover on this claim.
On the whole case the plaintiff is entitled to recover from the defendant the sum of $1,726.18. It is so ordered.
Madden, Judge; Jones, Judge-, Littleton, Judge; and Whaley, Chief Justice, concur.