PeR Curiam:
 

 This contract case was referred to Trial Commissioner William E. Day, pursuant to Rule 57(a), for findings of fact and a recommendation for a conclusion of law. The commissioner has filed his report containing an opinion, proposed findings of fact, and a recommended conclusion of law. He would hold that plaintiff is not entitled to recover and therefore its petition should be dismissed. The defendant accepts the commissioner’s opinion and proposed legal conclusion, but made objections to certain of his findings. The plaintiff accepts the commissioner’s findings but excepts to his recommended conclusion of law. Briefs have been filed and there has been oral argument.
 

 The court agrees with the opinion, findings, and recommended conclusion of the trial commissioner and adopts them, with modifications, together with this opinion, as the basis for its judgment in this case. However, plaintiff has urged before the court a legal theory not dealt with by the commissioner in his opinion. In short, the plaintiff argues that the United States should be responsible for the cost of repairing damage caused by the District of Columbia because the District was the agent of the United States acting under the Federal Government’s direction when the District rerouted the water main. This contention must be rejected.
 

 In the first place, the parties stipulated at the pretrial conference that “[t]he cave-in which occurred on the night of September 12-13, 1955, was not the result of any fault on the part of the plaintiff or the defendant.” Since what plaintiff is seeking to do before this court is to impute fault to the defendant through the actions of its alleged agent,
 
 *635
 
 the District of Columbia, it would seem that plaintiff is precluded by the stipulation from even raising this question of agency. A stipulation is a judicial admission binding on the parties making it absent special considerations.
 
 Bruno New York Industries Corp.
 
 v.
 
 United States,
 
 169 Ct. Cl. 999, 1007, 342 F. 2d 75, 79 (1965);
 
 Garner
 
 v.
 
 United States,
 
 161 Ct. Cl. 73, 75 (1963);
 
 McNamara
 
 v.
 
 Miller,
 
 269 F. 2d 511, 515 (D.C. Cir. 1959); 9 Wigmore, Evidence § 2590 (3rd Ed. 1940). Plaintiff has made no application to the commissioner or to the court to modify the stipulation.
 

 Plaintiff, however, maintains that it was clearly understood by the parties that the stipulation would not affect the liability
 
 vel non
 
 of the defendant for the negligent acts of others under its control. Counsel for defendant disputes that this was in fact the parties’ understanding. Even were we to agree with plaintiff that the stipulation is not a bar to a finding of liability based on the alleged negligence of the District of Columbia acting as the agent of the United States, it is clear that no such agency existed. Article 1, Section 8 of the Constitution, granting Congress the exclusive power to enact legislation for the District, does not make the District the agent of the Federal Government. Nor does it make the Federal Government liable for the actions of the District.
 
 Sweeney
 
 v.
 
 United States,
 
 152 Ct. Cl. 516, 522, 285 F. 2d 444, 447 (1961);
 
 Bundy
 
 v.
 
 United States,
 
 21 Ct. Cl. 429, 434 (1886);
 
 O'Toole
 
 v.
 
 United States,
 
 106 F. Supp. 804, 806-807 (D. Del. 1952),
 
 rev'd on other grounds
 
 206 F. 2d 912 (3rd Cir. 1953).
 

 Moreover, there is no proof that the water main was rerouted by the District of Columbia under the direction and supervision of the United States. Because the District had a water main which ran through the site of the new building, the District had to move the line so that plaintiff could excavate. Subsequently the new line burst and inundated plaintiff’s excavation site. These are the facts of this case. Plaintiff has failed to offer any evidence that the United States played any part in the rerouting other than the fact that it was the Government’s contract for the Senate Office Building which resulted in the rerouting. That evidence
 
 *636
 
 is not enough to establish, an agency relationship; the District of Columbia was not the agent of the United States at the time it committed its allegedly negligent acts.
 

 Accordingly, plaintiff’s petition is dismissed.
 

 Commissioner Day’s opinion,
 
 *
 
 as modified by the court, is as follows:
 

 This is a contract case in which the issue is quite simply which contracting party must bear the loss resulting from damage to contract work, substantially (but not fully) completed at the time the damage was inflicted, without fault of either party. The controversy stems from a contract between the plaintiff and the defendant, acting through the Architect of the Capitol for excavation, concrete footings and mats for the new United States Senate Office Building, for a consideration of approximately $750,000. The plaintiff agreed by the contract to accomplish all of this work. The defendant agreed that it would make partial payments, monthly, as the work progressed, and upon completion and acceptance of all the work, that the contractor would be paid the amount due under the contract upon its submission of a release of claims. The work was prosecuted by the plaintiff’s forces until August 29, 1955, when its job superintendent advised the defendant’s project engineer that the work was completed and that the plaintiff desired acceptance of the work. There remained to be paid the balance of about $180,000 of the contract price at this time. The defendant’s inspection force made an inspection of the work and found 10 items of work remaining to be accomplished. One of these items was not a contract requirement at all. It related to the furnishing of inscribed silver shovels to be used in ground-breaking ceremonies. This list was given to the plaintiff on September 9, 1955 (a Friday) when its representatives were discussing with the defendant’s representatives the question of the proper amount which should be paid for an extra under a change order. It is to be noted particularly that the plaintiff’s general manager, who was present at this meeting, took no exception to the fact
 
 *637
 
 that 9 of the 10 items listed were yet to be accomplished. It is clear from the evidence that none of the items involved substantial work and in the aggregate could fairly be regarded as minor. They were described during trial by both parties as punch-list items. No work of any kind was done at the site on September 9th. On Saturday, being a non-work day, no work of any kind was performed at the site. On Monday, the plaintiff had removed all of its equipment from the site with the exception of a few hand tools. On that day two of plaintiff’s laborers were working there, being engaged in sweeping and breaking off of protruding nails and tie wires. One of the laborers returned to the site at 5 a.m. on Tuesday, September 13, 1955, with the other arriving at 6 a.m. They were similarly engaged, when, at about 6:45 a.m. a cave-in occurred on the east side of the excavation, causing the sheet piling in the immediate area to be twisted, bent and covered with very large quantities of wet earth, and also inundating the entire excavation with water.
 

 The District of Columbia Water Department had recently completed the rerouting of a water main. A break in the main caused the resulting damage to the contract work. The parties have stipulated that the cave-in was not due to the fault of either plaintiff or defendant herein. Both parties disclaimed responsibility for the cost of repairing the damage caused by the cave-in. The evidence shows that, although the work was substantially completed when the cave-in occurred, there yet remained a small amount of work related to 5 of the 10 punch-list items.
 

 It further shows that, at the time of the cave-in, the plaintiff had not requested final inspection and none had been made by the inspection forces of the defendant. It is also clear that the work had not been accepted by the defendant.
 

 The Architect of the Capitol insisted that the plaintiff repair the damage to the work at its cost. The work was repaired by the plaintiff’s forces. It was then inspected and found to have been satisfactorily completed. Thereafter, the plaintiff submitted its final invoice for the balance remaining unpaid. There had, in the meantime, been a further progress payment of some $57,000. As one item of the final
 
 *638
 
 invoice, the plaintiff claimed some $23,000 as the cost of repairing the damage caused by the cave-in. The defendant paid some $123,000 as a final payment, refusing to pay the $23,000 item as the cost of repairing the damage caused by the cave-in.
 

 It is the plaintiff’s contention first, that all contract work was completed by the plaintiff but that even though it be found that some minor work remained to be done, the contract was completed as a matter of law, and thus, the risk of loss by reason of damage to the completed work should be bom by the defendant. A further contention made by the plaintiff is that under the changed conditions clause of the contract, Article 4, the plaintiff is entitled to a change order or modification because it encountered an “unknown condition of an unusual nature” by reason of the broken water main. The only case which plaintiff cites in support of its position as to a changed condition is
 
 Arundel
 
 v.
 
 United States,
 
 96 Ct. Cl. 77 (1942). The court, in that case, construed the standard “changed condition” clause and held that it referred to a latent condition existing at the time the contract was entered into and not one occurring thereafter. Although there is some slight difference in language between the clause there construed and the changed conditions clause in this contract, that language also refers to a latent condition at the time of contracting, not something discovered later. The second
 
 Arundel
 
 case, 103 Ct. Cl. 688, 710,
 
 cert.
 
 denied, 326 U.S. 752, supports this construction, since the identical clause contained in the contract in suit was there considered. See 85 A.L.R. (2d) 211, 230.
 

 Finally, the plaintiff contends that a change order which resulted in extending the period of performance into the period during which the cave-in happened is such a cardinal change as to constitute a breach of contract. This claim must be considered abandoned as the plaintiff has requested no findings of fact in support thereof. See Rule 57 (f).
 

 The Government contends simply that since the contract work had not been finally completed, inspected and accepted, the plaintiff had expressly agreed in the words of the contract to hold itself responsible for any damage to the work which occurred prior thereto.
 

 
 *639
 
 Both parties cite the careful annotation of the cases dealing with the question of who must bear loss from destruction of or damage to a building during performance of a building contract without fault of either party at 53 A.L.R. 103, as upholding its position.
 

 The starting point for our consideration of the issues raised must begin, with the fact that although the plaintiff’s performance of the work prior to the cave-in was substantially finished, there yet remained a few minor punch-list items yet to be corrected. The further fact also to be considered is that there had been no final inspection or acceptance by the defendant before the cave-in occurred.
 

 The pertinent contract provisions are found in the following;
 

 ARticle 10.
 
 Permits and responsibility for
 
 world.— The contractor shall * * * and shall be responsible for all materials delivered and work performed until completion and final acceptance. Upon completion of the contract the work shall be delivered complete and undamaged.
 

 # ^4 ífc ‡ ‡
 

 ARticle 16.
 
 Payments to
 
 contractors.—
 

 $ $ $ * $
 

 (b)
 
 * * *
 
 And provided further,
 
 That on completion and acceptance of each separate building, vessel, public work, or other division of the contract, on which the price is stated separately in the contract, payment may ■be made in full, including retained percentages thereon, less authorized deductions.
 

 (c) All material and work covered by partial payments made shall thereupon become the sole property of the Government, but this provision shall not be construed as relieving the contractor from the sole responsibility for all materials and work upon which payments have been made or the restoration of any damaged work, or as a waiver of the right of the Government to require the fulfillment of all the terms of the contract.
 

 * * ❖ * #
 

 From the above-quoted contract provisions, it may be readily perceived, that the plaintiff undertook, not alone to perform the work, but also to hold itself responsible to the defendant for any damage from whatever cause (since no exception appears) before it was completed and accepted.
 

 
 *640
 
 The plaintiff, having agreed to deliver for acceptance a fully completed and accepted foundation and excavation, must repair at its cost the damage which resulted from the broken water main of the District of Columbia government. The language of the decision of the United States Supreme Court in the case of
 
 Dermott
 
 v.
 
 Jones (Ingle
 
 v. Jones), 69 U.S. (2 Wall.) 1,7 (1865) is particularly apt.
 

 $
 
 *
 
 * * #
 

 That covenant it was his duty to fulfil, and he was bound to do whatever was necessary to its performance. Against the hardship of the case he might have guarded by a provision in the contract. Not having done so, it is not in the power of this court to relieve him. He did not make that part of the building “fit for use and occupation.” It could not be occupied with safety to the lives of the inmates. It is a well-settled rule of law, that if a party by his contract charge himself with an obligation possible to be performed, he must make it good, unless its performance is rendered impossible by the act of God, the law, or the other party. Unforeseen difficulties, however great, will not excuse him. [Footnote omitted.]
 

 Ht
 
 * # * *
 

 The principle, which controlled the decision of the cases referred to rests upon a solid foundation of reason and justice. It regards the sanctity of contracts. It requires parties to do what they have agreed to do. If unexpected impediments lie in the way, and a loss must ensue, it leaves the loss where the contract places it. If the parties have made no provision for a dispensation, the rule of law gives none. It does not allow a contract fairly made to be annulled, and it does not permit to be interpolated what the parties themselves have not stipulated.
 

 H* «I» H*
 

 Id.
 
 at 7.
 

 While the degree of completion was much more advanced in this case when the damage occurred than in the case of
 
 De Armas
 
 v.
 
 United
 
 States, 108 Ct. Cl. 436, 70 F. Supp. 605 (1947), the language of Judge Madden’s opinion at page 468 of that case is applicable to the case at bar. It reads:
 

 * * * * *
 

 The question, then, is, who must bear the loss from a destruction of a part of the work which the plaintiff
 
 *641
 
 had contracted to do, while that work was in an unfinished stage. The specifications, as shown in findings 3 and 33, require of the plaintiff a completed job, quite comparable to a construction job. He was to manufacture and sink the mattresses, cover them with stone and make the repairs to the jetty, as specified. The specifications as to final examination and acceptance certainly contemplated that the work should stand in place in a useful condition when the contract was completed. We think, therefore, that its being damaged by forces of nature and without anyone’s fault before it was completed and accepted as complete, was the plaintiff’s misfortune and loss.
 

 *****
 

 There is a marked similarity between the facts of this case and that of
 
 Mittry
 
 v.
 
 United
 
 States, 73 Ct. Cl. 341 (1931), There the plaintiff contracted to construct a group of buildings at the veterans’ hospital in San Fernando, California. The contract contained provisions substantially similar to the provisions of the contract in suit quoted above. The defendant had contracted with a gas company to supply gas for the hospital buildings. At a time when building No. 6 was substantially completed but for minor items such as sweeping, window washing, lock adjusting and painting, but before final inspection and acceptance, it was severely damaged by a gas explosion. It was determined that the cause of the explosion was due to the negligence of the plumbing contractor (an independent contractor) and the gas company. The court there said, at page 357:
 

 *****
 

 In view of the fact that the explosion was not caused by any fault or negligence on the part of either the plaintiffs or the defendant, and the obligations imposed upon plaintiffs by the contract to construct and deliver to the Government a building “in a complete and perfect state,” plaintiffs can not recover the cost incurred by them in reconstructing building No. 6. The building at the time of the explosion had not been inspected and accepted by the Government. _ It is true work upon the building was substantially finished and was ready for inspection, but until its final inspection and acceptance by the Government, the plaintiffs, under Article XIII of the contract, were responsible for its proper care and
 
 *642
 
 protection. The Government was entitled to receive a completed building.
 

 The rule is well settled that where a contractor undertakes to erect a building, and during the process of construction the building is injured or destroyed without fault of either party to the contract, the contractor is still bound by his undertaking to complete the building, and is liable in damages if he fails to do so. (Citing cases).
 

 The plaintiff places great reliance on the line of cases cited in 53 A.L.R. 103 at page 116, to the effect that where a contractor is to contribute only a part of the labor and materials toward the erection of a building, the owner or other independent contractors to do part of the work and furnish part of the materials, the contractor is discharged from his obligation by the destruction of the building before completion and may recover on an implied assumpsit for the value of what he has already done. Those cases are all clearly distinguishable from the case in suit in that their rationale runs contra to the express undertakings made by the plaintiff in the contract provisions quoted
 
 supra.
 

 The plaintiff also cites
 
 W. E. Callahan Const. Co.
 
 v.
 
 United States,
 
 91 Ct. Cl. 538 (1940). In that case however, the damage to the contractor’s work had been caused by the acts of the authorized agents of the United States, whereas in this case, the damage to the work was, as the parties have stipulated, without fault as to either contracting party. The case is accordingly inapposite.
 

 It is concluded that the plaintiff is not entitled to recover, and, therefore, its petition is dismissed.
 

 FINDINGS or Fact
 

 1. Plaintiff is a corporation organized and existing under the laws of the State of Delaware and has its principal office in Philadelphia, Pennsylvania. The contract in suit was managed and supervised out of its local office in Arlington, Virginia.
 

 2. On January 10, 1955, John McShain, Inc., entered into a contract with the United 'States of America, identified as No. ACSO-213, Job No. 54110. By the terms of said con
 
 *643
 
 tract John McShain, Inc., promised to furnish materials and perform work for the excavation, concrete footings and mats for an additional office building for the United States Senate in Washington, D.C., and in consideration for said promise, the United States of America promised to pay John McShain, Inc., the sum of $747,200.
 

 3. The contract was executed on behalf of the United States of America by J. George Stewart, Architect of the Capitol, as contracting officer.
 

 4. The contract contained the following pertinent provisions :
 

 $ * $ $ $
 

 Article 3.
 
 Changes.
 
 — The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. No change involving an estimated increase or decrease of more than Five Hundred Dollars shall be ordered unless approved in writing by the head of the department or his duly authorized representative. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered:
 
 Provided,
 
 however, That the contracting officer if he determines that the facts justify such action, may receive and consider, and with the approval of the head of the department or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in article 15 hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.
 

 Article 4.
 
 Chcmged conditions.
 
 — Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for
 
 *644
 
 in the plans and specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The contracting, officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall, with the written approval of the head, of the department or his duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions.
 

 ARticlb 5.
 
 Extras.
 
 — Except as otherwise herein provided, no charge for any extra work or material will be allowed unless the same has been ordered in writing by the contracting officer and the price stated in such order.
 

 Article 10.
 
 Permits and, responsibility for
 
 work.— The contractor shall, without additional expense to the Government, obtain all required licenses and permits and be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work, and shall be responsible for all materials delivered and work performed until completion and final acceptance. Upon completion of the contract the work shall be delivered complete and undamaged.
 

 $ ‡ ‡ ‡
 

 Article 15.
 
 Disputes.
 
 — Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the contracting officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the contractor. Within 30 days from the date of receipt of such copy, the contractor may appeal by mailing or otherwise furnishing to the contracting officer a written appeal addressed to the head of the department, and the decision of the head of the department or his duly authorized representatives for the hearings [sic] of such appeals shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence, be final and conclusive : Provided, That if no such appeal to the head of the department is taken, the decision of the contracting officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the contractor shall be afforded an opportunity to be heard and to offer
 
 *645
 
 evidence in support of its appeal. Pending final decision of a dispute hereunder, the contractor shall proceed diligently with the performance of the contract and in accordance with the contracting officer’s decision.
 

 Aeticlb 16.
 
 Payments to contractors.
 
 — (a) Unless otherwise provided in the specifications, partial payments will be made as the work progresses at the end of each calendar month, or as soon thereafter as practicable, on estimates made and approved by the contracting officer. In preparing estimates the material delivered on the site and preparatory work done may be taken into consideration.
 

 (6) In making such partial payments there shall be retained 10 percent on the estimated amount until final completion and acceptance of all work covered by the contract:
 
 Provided, however,
 
 That the contracting officer, at any time after 50 percent of the work has been completed, if he finds that satisfactory progress is being made, may make any of the remaining partial payments in full:
 
 And provided further,
 
 That on completion and acceptance of each separate building, vessel, public work, or other division of the contract, on which the price is stated separately in the contract, payment may be made in full, including retained percentages thereon, less authorized deductions.
 

 (c)
 
 All material and work covered by partial payments made shall thereupon become the sole property Of the Government, but this provision shall not be construed as relieving the contractor from the sole responsibility for all materials and work upon which payments have been made or the restoration of any damaged work, or as a waiver of the right of the Government to require the fulfillment of all the terms of the contract.
 

 (d)
 
 Upon completion and acceptance of all work required hereunder, the amount due the contractor under this contract will be paid upon the presentation of a properly executed and duly certified voucher therefor, after the contractor shall have furnished the Government with a release, if required, of all claims against the Government arising under and by virtue of this contract, other than such claims, if any, as may be specifically excepted by the contractor from the operation of the release in stated amounts to be set forth therein.
 

 íJí
 
 %
 
 ^
 

 5. Upon the payment to the plaintiff of certain balances due, the plaintiff executed and delivered to the defendant
 
 *646
 
 a release of all claims arising under or by virtue of tlie contract. The release contained only the following exceptions:
 

 * * * except the following: TWENTY-THREE THOUSAND NINE HUNDRED NINETY DOLLARS AND FOUR CENTS ($23,990.04).
 

 This release is given on the following express conditions :
 

 (1) John McShain, Inc. does not waive its rights to be paid this sum and
 

 (2) Reserves to itself all rights incident or related to the prosecution of its rights to recover this sum.
 

 ‡ *
 

 6. On August 29, 1955, the plaintiff, through its job superintendent, told Ira St. John, the defendant’s project engineer, who was in charge of the wort at the site for the defendant, that the work was completed and that the plaintiff wished to have the work accepted by the defendant. The plaintiff had been paid as the work had progressed, but $180,000 (round figure) remained to be paid at this time.
 

 7. On September 7,1955, St. John met with his inspectors for a discussion of the various items of work which were regarded as unsatisfactory and needing correction. It was indicated that the paintiff should be advised concerning such items and requested to make the necessary corrections. On .the same day, St. John discussed with the Architect of the Capitol, in a meeting at which other representatives of the Architect’s staff were present, the subject of the proper charges to be included in the proposed change order for work .Which had already been accomplished. On the same date, a ■meeting was arranged to take place on Friday, September 9, 1955, at 9:30 a.m.
 

 8. On September 9, 1955, the plaintiff’s general manager, J. P. Hauk, its estimator, William Russell, and representatives of the staff of the Architect of the Capitol attended a meeting in the office of the latter official, primarily to discuss the change order referred to in the preceding finding. At this meeting, Hauck was handed a copy of a paper called “Minutes of Meeting held on September 7th in the Architect’s field office * *
 

 
 *647
 
 The contents of such minutes were also discussed with Hauck, who was advised that Item 7, contained therein, “had already been adjusted.” It is here noted that there is no contract requirement concerning Item 10, the inscribed silver shovels for the ground-breaking ceremonies. The text of the minutes referred to above, is as follows:
 

 Minutes op Meeting held in Field Office on September 7th, 1955, to review the items of work to be done by the general contractor before release for final payment. Those present were Messrs. Pott, Middleton, Wilson, Tompkins, Judd and St. John.
 

 1. Shoring at northeast corner. Four shores were installed without concrete anchors. Also three additional shores on the alley side were installed without concrete anchors. In place of concrete anchors, mud sills were used. The concrete anchors were indicated and approved on McShain’s shoring drawing. However, the mud sills appear to be satisfactory and, therefore, will be accepted.
 

 2. The trenches in sub-basement foundation mats have considerable amount of concrete laying in them primarily at the junction of the floor and walls of the trenches. They will interfere with the installation of the piping in the trenches and also of the waterproofing, and should be removed.
 

 3. It was noted in many cases that the walls of the trenches in the foundation mats have offsets up to as much as one inch. These offsets occur at the junction of the separate pours for the concrete mats. The offsets will interfere with the placing of the waterproofing and should be chipped to eliminate an abrupt offset. It is felt that a gradual adjustment will be acceptable.
 

 4. The elevation of the tops of the mats at the subbasement level are too high in a good many places. Actually, our check indicated 27 locations at which the concrete was too high and that the areas of the portions of concrete varied from 3 feet in diameter to 10 feet in diameter. These high portions must be cut down so that the top of the footing is a minimum of one inch below the finished floor. This is required for the application of the waterproofing wearing surface. Also, we wish to advise that the contractor had
 
 *648
 
 been cautioned about this right at the start and during the pouring of these mats.
 

 5. It was noted that at the junction of the mats and the step footings considerable masses of concrete have been left on the surface at the intersection of the horizontal and vertical portion of the concrete foundation work. This extra concrete should be removed to permit suitable application of the waterproofing.
 

 6. We note that several tie wires and nails project from the concrete surfaces contrary to the specifi-tions, and they should be removed.
 

 7. We note on “C” Street that a portion of the sidewalks has been undermined and dropped below the average level and this should be filled in and covered with a suitable surface in order to prevent tripping hazards.
 

 8. Some of the shores and definitely the ones at Column footings 14-A and D-3 are too close to the center line of the column and will interfere with the erection of columns. Such shores require moving.
 

 9. The fence as now installed to replace the opening left by the dismantling of the field office is not satisfactory and is not in conformity with the rest of the fence construction. This should be renovated.
 

 10.The following is the inscription that should be made on the silver shovels which are to be furnished as a part of the ground-breaking ceremonies.
 

 SENATE OfEIOE BtJILDING Commission,
 

 William A. Ptjrtell,
 

 Chairman,
 

 Dennis Chavez,
 

 Styles Bridges,
 

 Theodore Francis Green,
 

 John J. Sparkman,
 

 George W. Malone,
 

 Karl E. Mtjndt,
 

 J. George Stewart,
 

 Architect of the
 
 Capitol,
 

 Otto K. Eggers,
 

 Associate
 
 Architects,
 

 John McShain,
 

 Foundation Builder.
 

 A.D. 1955.
 

 
 *649
 
 9. On September 9, 1955, sometime after the meeting referred to in the preceding finding, St. John began a vacation which continued through September 25. He was away from the city during this time.
 

 10. On September 9, 1955, a contract for the erection of the superstructure, i.e., the building above the foundation, of the Senate Office Building was executed by the Architect of the Capitol and an officer of the superstructure contractor.
 

 11. On Tuesday, September 13, 1955, between 6:30 and 6:45 a.m., a cave-in occurred at the east side of the foundation excavation. The steel shoring for a distance of 180 feet at the cave-in was twisted and pushed over by a large quantity of earth and water. It is clearly established in the evidence that the cause of the cave-in was a broken water main recently relocated by the District of Columbia Water Department. The parties have stipulated at pretrial that the cave-in was not due to fault on the part of either the plaintiff or of the defendant.
 

 12. Because of the occurrence described above, both parties took prompt action to disclaim responsibility incident to the cost of repair of the damage to the work. The plaintiff insisted that all work had been completed prior to the collapse of the shoring, and the defendant took the contrary position, that since all work had not been completed, and since the job had not been formally accepted, the plaintiff was bound to repair the damage and deliver a completed undamaged job for acceptance.
 

 13. Beginning about December 7, 1955, the plaintiff brought its forces back to the site of the work and began the task of repairing the damage resulting from the cave-in. By January 6, 1956, all work incident to the repair of the damage caused by the cave-in had been completed, the final inspection had been accomplished, and the plaintiff was advised by letter of that date that all contract work had been found to be satisfactorily completed and that it was accepted.
 

 14. After much discussion and haggling over the question as to payment for the work incident to the repair of the cave-in damage, the plaintiff, on March 11, 1957, submitted its invoice to the defendant together with the release referred to
 
 *650
 
 in finding 5. On the nest day a public vouclier was prepared for the final payment which showed the amount of $23,990.04 as the amount claimed by the plaintiff for repairs made necessary to remedy damage caused by the cave-in. The above amount was deducted from the amount claimed by the plaintiff and there was found to be due the amount of $123,520.16 which was paid in due course.
 

 15. Prior to Friday, September 9, 1955, the plaintiff had removed all its forces and equipment from the job.
 

 16. There is no convincing evidence in the record that the plaintiff began to do any of the work on the so-called punch-list items listed in finding 8 until Monday, September 12, 1955. On that day two laborers employed by the plaintiff were ordered “to come out and do some cleaning on the job”. On that day some sweeping of the top of the footings was done and projecting nails and tie wires were removed by breaking. The chipping off of the tops of the mats required as item 4 of the punch list must have been accomplished earlier, since all work covered by this punch-list item had been done before Monday, September 12.
 

 ■ Because of the early hour at which the cave-in occurred on the morning of Tuesday, September 13, 1955, it had not been possible for the two laborers employed by the plaintiff to have accomplished much additional work on the punch-list items. This is so because one man had been on the job less than an hour and the other man for about an hour and one-half at the time of the cave-in.
 

 17. Between the time of the cave-in and the return to the job site of St. John, no further work at the job site had been accomplished by the plaintiff.
 

 18. On September 26, 1955, St. John returned from his vacation. He visited the job site and observed the effects of the cave-in. He ordered his staff to make an inspection to see whether or not the items of work listed in the minutes of the meeting of September 7, 1955 (listed in finding 8) had been completed by the plaintiff. The staff made the inspection on the nest day and made a report showing as to each item its status as to completion or non-completion. That report, in evidence as defendant’s Exhibit 14, showed that all
 
 *651
 
 items of work bad been completed except items 5,6 and 8, and that it was not possible to determine the status of completion as to items 2 and 3, since the trenches were full of water. The work required by items 2 and 3 was later found to have not been completed by the plaintiff. It is found that, although very minor in relation to the total contract work, the punch-list items had not been fully completed by plaintiff before the cave-in. There had, of course, been no final inspection and acceptance prior to the cave-in, nor had such final inspection been requested by the plaintiff.
 

 19. On January 6, 1956, the United States accepted the performance of work by John McShain, Inc., including all work necessary to the restoration of the job site following the cave-in of September 13,1955.
 

 Conclusion oe Law
 

 Upon the foregoing findings of fact and opinion, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and its petition is therefore dismissed.
 

 *
 

 The opinion, findings of fact and recommended conclusion of law are submitted under the order of reference and Rule 57(a).