161 N.J. Super. 99 (1978)
390 A.2d 1210
THE HARTFORD FIRE INSURANCE COMPANY, PLAINTIFF-APPELLANT,
v.
RIEFOLO CONSTRUCTION CO., INC.; THE CONDITIONING CO., INC.; FLUORO ELECTRIC CORPORATION; ELIZABETH IRON WORKS, INC.; GROVE PLUMBING & HEATING CO.; THE HOME INDEMNITY CO.; EMPLOYERS COMMERCIAL UNION INSURANCE CO.; THE MARYLAND CASUALTY CO.; THE AMERICAN INSURANCE CO.; THE BOARD OF EDUCATION OF THE VOCATIONAL SCHOOLS IN THE COUNTY OF ESSEX; SENTRY INSURANCE; AND UNITED STATES FIDELITY & GUARANTY CO., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 9, 1978.
Decided June 15, 1978.
Supplement to Opinion July 31, 1978.
*102 Before Judges LYNCH, BISCHOFF and KOLE.
Mr. Charles H. Hoens, Jr. argued the cause for appellant (Messrs. Lum, Biunno & Tompkins, attorneys; Mr. Richard J. Biunno on the brief).
Mr. Robert C. Gruhin argued the cause for respondent Riefolo Construction Co., Inc.
Mr. Barry Blum argued the cause for respondents Fluoro Electric Corporation and The Maryland Casualty Company (Messrs. Press & Blum, attorneys).
Mr. Arnold L. Simon argued the cause for respondents The Conditioning Co., Inc. and Employers Commercial Union Insurance Co.
Mr. Allan Maitlin argued the caues for respondents Elizabeth Iron Works, Inc., Grove Plumbing & Heating Co. and The Home Indemnity Co. (Messrs. Feuerstein, Sachs & Maitlin, attorneys).
Mr. John D. Ronca argued the cause for respondent Sentry Insurance (Messrs. Ronca & McDonald, attorneys; Mr. William J. Hanley on the brief).
*103 Messrs. Weltchek, Prupis & Ritz filed a brief on behalf of respondent The American Insurance Company.
Respondent Board of Education of the Vocational Schools in the County of Essex did not file a brief.
Messrs. Budd, Larner, Kent, Gross, Picillo & Rosenbaum did not file a brief for respondent The Home Indemnity Co. but relied upon the briefs filed on behalf of respondents Riefolo Construction Co., Inc. and Grove Plumbing & Heating Co.
The opinion of the court was delivered by BISCHOFF, J.A.D.
The chief issue presented by this appeal calls for a determination of the nature and extent of the contractual liability of prime contractors to repair and replace damage caused to a school building under construction by a fire of undetermined origin at a time when the structure was more than 90% but less than 100% completed.
On or about April 14, 1972 the Board of Education of the Vocational Schools of Essex County (board) contracted with five prime contractors (contractors) for the construction of a vocational school building to be known as the Essex County Technical Careers Center at West Market and Wickliffe Streets in Newark. The five prime contractors, Riefolo Construction Company, Inc. (Riefolo), The Conditioning Co., Inc. (Conditioning), Fluoro Electric Corporation (Fluoro), Elizabeth Iron Works, Inc. (Elizabeth) and Grove Plumbing & Heating Co. (Grove), are five of the defendants herein. The contracts incorporated both General and Special Conditions.
The General Conditions required, among other things, all contractors to furnish "a performance bond in an amount at least equal to 100% of the contract price." Each of the prime contractors complied with this provision, and the sureties on said bonds are also defendants in this action.
*104 The base contract signed by all contractors provided that the work should be commenced on or before a date specified in a written "Notice to Proceed," and be completed within 540 consecutive calendar days thereafter. Each contractor received a written "Notice to Proceed" in April 1972, notifying it that the scheduled completion date was October 22, 1973. Two of the General Conditions and Special Conditions, relevant to the issues herein, provided:

PROTECTION OF WORK AND PROPERTY  EMERGENCY
The Contractor shall at all times safely guard the Owner's property from injury or loss in connection with this contract. He shall at all times safely guard and protect his own work, and that of adjacent property, from damage. The Contractor shall replace or make good any such damage, loss or injury unless such be caused directly by errors contained in the contract or by the Owner, or his duly authorized representative. * * * [§ 13, General Conditions]

Protection and Damage
(a) All contractors shall exercise precaution for the protection of all work under this project and each and all will be held responsible for all breakage or other damage up to the time the building is accepted by the Owner. * * * [§ 1.39, Special Conditions]
The General Conditions (§ 28) also required the contractors to maintain various types of insurance "during the life of the contract," including builder's risk insurance on "a 100% completed value basis on the insured portion of the project."
At the beginning of the contract period each contractor notified the board that it then had insurance coverage in effect, including Builder's risk policies as required by the contract.
Construction was not completed by the scheduled completion date in October 1973 and, in April 1974, the board began to assign personnel to the building[1].
*105 On May 17, 1974 the architect wrote to the board, advising that its staff could use the executive office area in the building, but that no educational processes could be carried on in the building until it was 100% completed and accepted.
In June certain custodians, clerks and guidance counsellors were assigned to the building and, on July 2, 1974, the architect again wrote to the board, advising that the Department of Education would now permit occupancy of any part of the building for staffing and registration. Prior to August 9, 1974 a total of 16 people were assigned to the school. Commencing on or about June 9, 50 to 100 prospective students were interviewed on the premises daily. However, no classes were held on the premises prior to August 9, 1974.
On August 8, 1974 the board ordered insurance coverage on the school from plaintiff Hartford Fire Insurance Company (Hartford). Coverage was approved the same day and a binder was issued evidencing coverage in the amount of $6,500,000. The coverage was added to existing policies. At the time of the issuance of the binder, the agent of Hartford knew the building was but 90% to 92% completed. The board had previously obtained insurance coverage on furniture and other personal property which it had placed in the building.
On the afternoon of August 9, 1974 a fire started in the third-floor hallway of the school and caused considerable damage. The fire apparently started among some cartons *106 holding equipment belonging to the board, but no determination has ever been made as to the origin of the fire.
On August 21, 1974 the architect sent a telegram to all prime contractors but Elizabeth, notifying them they should proceed at once to "remove and replace in kind all work of your trades damaged by" the fire and "the funds for this work will be reimbursed to the board by the respective insurance underwriter-obligees of the Owner and the four involved prime contractors."
Defendant Elizabeth's builder's risk insurance was permitted to lapse on July 1, 1973; defendant Fluoro permitted its builder's risk to lapse in July 1974; defendant Riefolo permitted its builder's risk insurance policy to lapse on April 9, 1974. Defendant Grove had a builder's risk policy in effect at the time of the fire. While Conditioning initially had a policy in effect terminating on January 30, 1974, a dispute exists with respect to whether it was renewed for another year. That dispute is in litigation in a pending third-party action between Conditioning, defendant Sentry Insurance and Alfred Harris. That issue is not now before us.
The contractors made the necessary repairs and submitted bills for the work totalling $258,757.36. The board submitted the bills to Hartford, pursuant to the policy issued by it, and ultimately the contractors were paid by the board after the board was paid by Hartford. Hartford demanded reimbursement from the contractors, computed pursuant to the provisions of § 1.39(b) of the Special Conditions, providing:
* * * Where the responsibility [for the damage] cannot be determined definitely by the Architect, the cost of reparation of the damage will be divided among all the prime contractors, to which each agrees by virtue of this contract, prorata in proportion to each contract amount.
The contractors, their sureties and builder's risk insurance carriers refused to pay and this suit followed.
*107 Following a pretrial conference, the case was submitted on a stipulation of facts and briefs.
The trial judge, in a letter opinion, stated that essentially two issues were presented to him for determination: (1) whether Hartford possessed any subrogation rights against defendants and, (2) if so, whether defendants possessed any defenses, sufficient to defeat Hartford's subrogation claim.
On the first issue the trial judge held that Hartford did have a right of subrogation but, as to the second, he held the duty of the contractors to repair and replace the damage to the work was coextensive with the duty of the contractors to maintain builder's risk insurance; that while the contractors did breach their contractual duty to maintain builder's risk insurance, any insurance company on such a policy would have a valid defense to an action brought on it because (a) the building was substantially complete at the time of the fire and (b) the board had occupied the building without the permission of the insurance carrier; therefore, the board did not sustain any damage because of this breach.
In stating why he concluded that § 13 of the General Conditions, which required the contractors to make good all losses except that caused by the board or by the contract, and § 28(e) of the General Conditions, which required the contractors to maintain builder's risk insurance during the life of the contract, where coextensive, the trial judge said:
The purpose of requiring the contractors to supply insurance is to provide for the necessary source of security in the event of a loss during construction. To require that contractors retain liability for loss even when there is no longer the possibility of maintaining builder's risk insurance would certainly constitute an unconscionable result, especially where insurance can be easily procured by the owner and where actions taken by the owner have contributed to the property ceasing to be insurable by the contractors.
The two paragraphs must be read together to require contractors to make good any losses to the property while the premises are or may be insured by them. The failure to provide adequate insurance *108 while such insurance is or may be available pursuant to Paragraph 28(e) would subject the contractors to liability for restoration of the premises pursuant to Paragraph 13. Therefore, to the extent that actions taken by the Board may be defenses against claims based on the breach of the duty to insure, they are defenses as well to make claims based on the breach of the duty to make good losses.
Judgment was entered for defendants and plaintiff appeals.

I
We consider, first, whether Hartford, as a subrogee of the board, may maintain this action against the contractors and their sureties on the performance bonds.
Defendants argue that Hartford is unable to maintain this action because:
(1) An insurance company cannot sue for breach of a contractual undertaking between its insured and a third party because the only rights of subrogation an insurance company has are against the person responsible for the loss suffered by the insured, ordinarily the tortfeasor; and
(2) Plaintiff, by its inequitable conduct, is estopped from recovering.
The first argument is plainly without merit. The applicable rule is stated in Standard Accident Ins. Co. v. Pellecchia, 15 N.J. 162 (1954), as follows:
In subrogation suits, based not on the torts of a third party but on his contractual obligation to the insured, there was some reluctance in the early decisions to permit any recovery. It is difficult to understand why any court that would permit subrogation against a tortfeasor should hesitate to allow subrogation based on a contractual obligation of the defendant, for the assignment of tort claims was frowned upon at law while the assignment of choses in action and of many kinds of contracts was encouraged. It is now well settled generally that such an action in subrogation on the contractual obligation of the defendant to an insured exists in favor of the insurer. Thus, in Federal Insurance Co. v. Englehorn, 141 N.J. Eq. 349, 351 (1948), our Court of Errors and Appeals in affirming the judgment below adopted the opinion of the lower court, which stated that "there is also authority for the proposition that the insurer's right to subrogation is not limited to claims based on tort but extends to a cause of action by the insured against a third party founded on contract * * *." [at 178-179]
*109 Contrary to the argument of defendants herein, that court also held that where a subrogation claim is instituted by an insurer on a contract claim, a showing by the subrogee of a "superior equity" is not required. Rather, recovery is permitted "as long as the conduct of the insurer and the insured has not been such as to make the granting of relief unconscionable." Standard Accident Ins. Co. v. Pellecchia, supra at 182; see also id. at 188-189.
The contractors argue that inequitable conduct on the part of Hartford and the board can be found from the following facts:
(1) Hartford charged the original binder which added the coverage of the school under a standard fire insurance policy into a builder's risk policy after the fire occurred.
(2) Change orders for the repair of the fire damage were executed by the contractors with the expectation that they would be paid, and when assurances were given that they would be paid, they abandoned their investigation into the actual cause of the fire. Then, after the work was performed, Hartford attempted to obtain an injunction against payment by the board to the contractors for their services.
(3) All contractors had liability insurance carriers who would have responded in damages had it been ascertained that the fire was caused by the negligence or fault of one or more of the five contractors. The assurance of payment by the board and Hartford for the repairs or replacements caused the liability carriers to cease their investigation into the cause of the fire.
Substantially, these same arguments were made to the trial judge, who disposed of them by saying:

* * *
There being no claim of unconscionable activity by any party, plaintiff was under no obligation to prove equities in his favor superior to that of the contractors as a precondition to subrogation.

* * *
It is true that Hartford issued its policy to the Board with knowledge that the building in question was less than 100 per cent completed. Since it was only subsequent to the fire that Hartford required *110 the addition to its policy of a bulider's risk endorsement and since there is no evidence that the Board was aware that the builder's risk policy of its contractors had lapsed, it is questionable whether the policy issued by Hartford on August eighth was intended to be a builder's risk or straight fire policy. Hartford contends that the policy issued was builder's risk, but this contention appears to be only an afterthought on the part of Hartford. The Board certainly had no intent to provide its own builder's risk policy since it was assumed that such insurance was already in effect.
This Court would be loathe to allow a forfeiture of Hartford's claims merely because of Hartford's failure to timely label its insurance so as to maximize its legal rights. Equity regards the substance rather than the form of a transaction. It is clear that, under whatever name, Hartford was contractually bound to insure the loss sustained to the subject premises as of August 9, 1974 * * *.
Whether the contentions of defendants be considered in support of a claim of "unconscionable conduct" or "inequitable conduct" on the part of plaintiff, the same result is reached.
As to the first, defendants did not contend at trial, and do not contend here, that "unconscionable conduct" has been established. In any event, we do not find in this record any "unconscionable conduct" on the part of either the board or Hartford. As to the contractors' contention of the existence of an estoppel grounded on "inequitable conduct," since this right of subrogation is based on contract rather than tort, superior equities are not an essential ingredient of plaintiff's right to maintain it and thus there is no estoppel. Standard Accident Ins. Co. v. Pellecchia, supra.
We hold that Hartford has a right to maintain this action as subrogee of the board and is not barred by its conduct from doing so.

II
Plaintiff advanced two basic theories of liability at trial: first, that the contractors breached their contracts by failing to maintain the required builder's risk insurance in effect; and, second, the contractors had a contractual duty to repair the damage caused by the fire at their own expense and their *111 refusal to do so constituted a second, independent breach of the contract.
Hartford contends the trial judge erred in holding that the duty to "replace or make good" any damage to the owner's property (§ 13, General Conditions) and the duty to procure and maintain builder's risk insurance during the life of the contract (§ 28(e), General Conditions) were coextensive and that the two sections "must be read together to require the contractor to make good any losses to the property while the premises are or may be insured by them." Thus, he held that any defenses which defendants had to Hartford's claim based on a breach of the duty to insure were valid defenses to claims based on a breach of the duty to "replace or make good" the loss.
Hartford further argues that the trial judge erred when he concluded it would be unconscionable to require the contractors to retain liability when there was no possibility of obtaining or maintaining builder's risk insurance.
In our resolution of this issue we assume, arguendo, that the trial judge was correct in holding that (a) the occupancy of the building by the board and (b) the substantial completion of construction, rendered maintenance of builder's risk insurance impossible and constituted valid defenses to a claim that there was a breach of the duty to maintain builder's risk insurance.
In addition to § 13 of the General Conditions, which required each of the contractors to "replace or make good" any damage to the project, the following sections of the contract documents are relevant. Section 25 of the General Conditions provides for partial payments for part performance until final completion of all the work covered by the contract and occupancy, and continues:
All material and work covered by partial payments made shall thereupon become the sole property of the Owner, but this provision shall not be construed as releiving the Contractor from the sole responsibility for the care and protection of materials and work upon which payments have been made or the restoration of any damaged work, *112 or as a waiver of the right of the Owner to require fulfillment of all the terms of the contract. [§ 25(c), General Conditions.]
Further, § 1.39 of the Special Conditions provided:
(a) All contractors shall exercise precaution for the protection of all work under this project and each and all will be held responsible for all breakage or other damage up to the time the building is accepted by the Owner.
(b) Where the breakage, soil deterioration or other damage is known to have been caused by the act or negligence of anyone or anything under the jurisdiction of any contractor, the breakage or damage shall be made good to the satisfaction of the Architect by the contractor under whose jurisdiction the damaged work falls, and the cost of reparation shall be paid for by the prime contractor responsible for the damage. Where the responsibility cannot be determined definitely by the Architect, the cost of reparation of the damage will be divided among all the prime contractors, to which each agrees by virtue of this contract, prorata in proportion to each contract amount.
Where, as here, the cause of the fire was not determined, the contract squarly places upon all contractors the obligation to protect the work of all other contractors and to repair and replace any damage or loss to the project.
In the case of School Trustees of Trenton v. Bennett, 27 N.J.L. 513 (Sup. Ct. 1859), the issue was whether the builder was required to repair and complete the building, where the builder contracted to "build, erect and complete a building" for a fixed price and before completion the building fell down by reason of a latent defect in the soil. The court held the builder was so obligated, saying:
No rule of law is more firmly established by a long train of decisions than this, that where a party, by his own contract, creates a duty or charge upon himself, he is bound to make it good if he may, notwithstanding any accident by inevitable necessity, because he might have provided against it by his contract; therefore, if a lessee covenant to repair a house, though it be burned by lightning, or thrown down by enemies, yet he is bound to repair it. [Id. at 517-518; emphasis in original.]

* * * * * * * *
No matter how harsh and apparently unjust in its operation the rule may occasionally be, it cannot be denied that it has its foundations *113 in good sense and inflexible honesty. He that agrees to do an act should do it, unless absolutely impossible. He should provide against contingencies in his contract. Where one of two innocent persons must sustain a loss, the law casts it upon him who has agreed to sustain it, or rather the law leaves it where the agreement of the parties has put it; the law will not insert, for the benefit of one of the parties, by construction, an exception which the parties have not, either by design or neglect, inserted in their engagement. [Id. at 519-520; emphasis in original]
The same rule was stated as dictum in the case of Woodbridge Tp. Bd. of Ed. v. Kane Acoustical Co., 51 N.J. Super. 319 (App. Div. 1958):
In the absence of contractual arrangements to the contrary, the risk of loss by fire to a new building in course of construction is presumed to fall upon the builder. If it burns, it must be rebuilt by the builder, without additional compensation. [at 327]
See also, Matthews Constr. Co. v. Brady, 104 N.J.L. 438, 443 (E. & A. 1928).
In John McShain, Inc. v. United States, 375 F.2d 829, 179 Ct. Cl. 632 (1967), a contractor for the United States Government was engaged in making excavations for a government building when the excavation collapsed, allegedly caused by the negligence of the District of Columbia in rerouting a water main which subsequently burst and flooded the excavation site. The court stated the issue in the following terms:
This is a contract case in which the issue is quite simply which contracting party must bear the loss resulting from damage to contract work, substantially (but not fully) completed at the time the damage was inflicted, without fault of either party. * * * [at 831]
and held:
* * * The plaintiff, having agreed to deliver for acceptance a fully completed and accepted foundation and excavation, must repair at its cost the damage which resulted from the broken water main of the District of Columbia government. * * * [at 834] *114 See also, Lititz Mutual Ins. v. Lengacher, 248 F.2d 850 (7 Cir.1957); Commonwealth v. Nelson-Pedley Constr. Co., 303 Pa. 174, 154 A. 383 (Sup. Ct. 1931); 13 Am. Jur.2d, Building, etc., Contracts, § 64 at 67; cf. Anfield v. Love, 5 N.J. Super. 347 (App. Div. 1949).
The foregoing cases hold that, in the absence of some provision in a contract to the contrary, the risk of loss occurring during construction is on the builder. If the parties intended to alter this basic principle to provide that the builder's liability was limited to his ability to insure against it, as the contractors here contend, then the contract should clearly express that agreement.
A provision in a contract that either the owner or the builder shall carry fire insurance while a building is under construction does not alter the foregoing rule placing the risk of loss on the builder. Commonwealth v. Nelson-Pedley Constr. Co., supra; Lititz Mutual Ins. v. Lengacher, supra; Annotation, "Building Contract-Destruction," 53 A.L.R. 103, 131 (1928).
The continued viability of such a harsh rule rests upon the principle that in the negotiations that result in the contract which creates the duty to complete a building, the parties could easily provide for a different result in the event difficult or unexpected circumstances occur. School Trustees of Trenton v. Bennett, supra; John McShain, Inc. v. United States, supra; Edwards v. Leopoild, 20 N.J. Super. 43, 53 (App. Div.), certif. den. 10 N.J. 347 (1952).
The problem is one of simple contract law. Courts cannot make contracts for the parties. They can only enforce the contracts which the parties themselves have made. Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43 (1960). And when the terms of a contract are clear and unambiguous, it is the function of the court to enforce it as written and not to attempt to make a better contract for either of the parties. Id. at 43. The courts cannot insert exceptions in a contract that the parties might have done but did not do, nor relieve *115 them from hardship that they might have guarded against in their contracts.
The contract before us places upon the contractors the obligation of completing the work covered by their respective contracts and, if it becomes necessary, to "repair and replace any damage or loss" to the project. We see no indication in the contract, or any of the contract documents, of any intention to alter or modify this clearly expressed obligation to repair fire damage so that it is dependent upon the maintenance of insurance. The obligation to repair and replace damage to the project is a separate and distinct obligation enforceable without reference to the separate obligation to maintain insurance.
Some of the contractors argue that their work on the building had been substantially completed and only small exterior items remained to be done. The arguments, in essence, are that substantial completion of their contractual work terminated their obligation to replace or repair fire damage, for which their responsibility as to origin has not been ascertained.
The short answer to this contention is provided by the contract in § 11 of the General Conditions, entitled "Contractors' Obligations," which requires the contractor to "complete the entire work to the satisfaction of the Architect/Engineer and the Owner." It is undisputed that none of the contractors had completed their entire contract work, nor did the architect, engineer or owner ever indicate completion to their satisfaction.

III
Hartford argues that the bonding companies, defendants The Home Indemnity Co., Employers Commercial Union Insurance Co., The Maryland Casualty Co., and The American Insurance Co., are liable to the board for all contract breaches of their respective principals including any breach of, or default in the obligation to repair and replace the fire damage. The trial judge, having found the principals *116 free from liability to Hartford, made no finding on that issue.
All of the performance bonds issued here incorporate the contract and contract documents existing between the principals and the board and contain very broad language to describe the undertakings of the surety:
NOW, THEREFORE, if the Principal shall well, truly and faithfully perform its duties, all the undertakings, covenants, terms, conditions, and agreements of said contract during the original term thereof, and any extensions thereof which may be granted by the Owner, with or without notice to the Surety, and if he shall satisfy all claims and demands incurred under such contract, and shall fully indemnify and save harmless the Owner from all costs and damages which it may suffer by reason of the failure to do so, and shall reimburse and repay the Owner all outlay and expenses which the Owner may incur in making good any default, then this obligation shall be void; otherwise to remain in full force and effect.
The language of the bond is clear, unambiguous and broad enough to encompass the liability of the surety for breach of the duty to repair or replace any fire damage.
The disputed item, that is, repair and replacement of the fire damage, relates directly to the contract obligation. It is not a collateral issue such as unpaid subcontractor claims, Amelco Window Corp. v. Federal Ins. Co., 127 N.J. Super. 342 (App. Div. 1974), or unpaid insurance premiums, Key Agency v. Continental Cas. Co., 31 N.J. 98 (1959); Annotation, "Contractor's Bond-Insurance Premiums," 129 A.L.R. 1087, 1092 (1940), nor claims against a principal based upon conduct falling outside the scope of the contract that the performance bond was issued to secure. Tri-State Ins. Co. v. United States, 340 F. 2d 542 (8 Cir.1965).
The breach of any one of several conditions in a bond will impose liability on the surety. 72 C.J.S. Principal and Surety § 95 at 574. We hold that the breach of the contractual obligation to repair or replace fire damage is such a breach, and is covered by the performance bond. The existence of fire insurance acquired by the board does not *117 alter or diminish the undertaking of either the principal or the surety under these circumstances. Performance bonds are for the benefit of the owner of the property under construction. Key Agency v. Continental Cas. Co., supra; Tri-State Ins. Co. v. United States, supra; Samuel Braen's Sons, etc. v. Fondo, 52 N.J. Super. 188 (App. Div. 1958).
We have previously held that Hartford may sue as subrogee to enforce the board's rights under the construction contract and that includes the right to proceed on the performance bonds, should the principals default.
Holding as we do, that the contractual obligation to repair or replace is a separate, enforceable obligation sufficient, standing alone, upon which to base the liability of the contractors, it is unnecessary for us to consider:
(1) Whether the obligation to carry builder's risk insurance was breached and, if so, the appropriate measure of damages for such a breach; or
(2) Whether the obligation to carry builder's risk insurance is within the terms and coverage of the performance bonds so as to impose liability for a breach thereof upon the sureties on the bond; or
(3) Whether either (a) the occupancy of the school by the board, or (b) the substantial completion of the construction of the building was sufficient to constitute valid defenses to a claim for damages under a builder's risk insurance policy.
We accordingly reverse the judgment of the trial court and remand the matter for ascertainment of the amount of damages which Hartford is entitled to recover and the determination of the identity of defendants and the sureties liable therefore, as well as the proper apportionment of defendants' prorata liability under the terms of the contract.

SUPPLEMENT TO OPINION.
The four bonding companies referred to in section III of our opinion have all filed motions for a rehearing contending, among other things, that
*118 The Court erred in directing the entry of judgment of liability against the defendant [bonding companies] when no trial on the merits against said defendants was held in the Chancery Division.
This contention is based upon a misunderstanding of our opinion.
The pretrial order entered in the Chancery Division provided in paragraph 12:
It is understood that the bonding companies will not participate in the trial to the extent that it is concerned with the liability of the principals-contractors, but will be free to participate later in the event the contractors' liability is established on the question as to whether such liability is covered by the bonds.
One of the issues raised in the brief of appellant Hartford was the potential liability of the bonding companies for all contract breaches of their respective principals, including any breach of, or default in, the obligation to repair and replace the fire damage. Counsel for all the bonding companies filed briefs responding to this issue and participated in the oral argument of the appeal. At no time did anyone argue or contend that consideration of the issue was premature, untimely or inappropriate.
Whether the performance bonds included the contractual liability of the principals to repair or replace the fire damage presents a question of law which was properly before us. Our decision was restricted to a resolution of that narrow issue, and we did not impose liability upon the bonding companies. Their liability, if any, will be determined by appropriate proceedings in the Chancery Division.
The matter is remanded to the Chancery Division for further proceedings consistent with our opinion and this Supplement. The pleadings and the pretrial order will determine the defenses available to the bonding companies except, of course, the narrow legal issue that we have decided.
NOTES
[1] § 1.37 of the Special Conditions, "Occupancy vs. Acceptance of the Project," provides:

No part of the project shall be considered accepted by the Owner until all work is complete including all punch-list items originated prior to the acceptance date. Whereas the Owner has economic need to occupy the project after the stipulated completion date, should the contractor not have all work completed by the completion date stated in the contract, regardless of approved extensions of time, then the Owner shall have the right thereafter to occupy all or any part of the project for his intended use. Thereafter, the contractor shall schedule the work remaining, so as not to interfere with normal use by the Owner. * * *.