171 N.J. Super. 529 (1979)
410 A.2d 252
PAUL T. ONDERDONK ET AL., PLAINTIFFS-APPELLANTS AND CROSS-RESPONDENTS,
v.
THE PRESBYTERIAN HOMES OF NEW JERSEY, INC., ET AL., DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 10, 1979.
Decided December 11, 1979.
*532 Before Judges LORA, ANTELL and PRESSLER.
Robert C. Neff argued the cause for plaintiffs-appellants and cross-respondents (Shanley & Fisher, attorneys; Nancy R. Tarlow on the brief).
Garrett M. Heher argued the cause for defendants-respondents and cross-appellants (Smith, Stratton, Wise & Heher, attorneys; Allen N. Grossman, Charles F. Martinson and Ann Reichelderfer on the brief).
The opinion of the court was delivered by ANTELL, J.A.D.
Plaintiffs are residents of a total care retirement community known as Meadow Lakes in Hightstown, New Jersey, which is owned and operated by defendant Presbyterian Homes of New Jersey, Inc. ("Homes").[1] Relations between each plaintiff and Homes are governed by a contract entitled a Residence Agreement, and this action was brought on allegations of mismanagement, conspiracy, constitutional and statutory violations, insolvency and a multitude of contractual and fiduciary breaches. The complaint, filed by plaintiffs individually and as representatives of a class, sought declaratory and injunctive relief, the appointment of a receiver, damages and the imposition of a constructive trust. A number of these claims were withdrawn *533 and plaintiffs now appeal from a judgment of the Chancery Division which denied all but one of those remaining. Also before us is defendant's cross-appeal from the Chancery Division's award of $2,500 in damages to plaintiff Onderdonk based on a finding that defendant had wrongfully attempted to evict Onderdonk as a reprisal in violation of N.J.S.A. 2A:42-10.10.
We have the benefit of a comprehensive formal opinion by the trial judge containing detailed findings of fact.
Sometimes referred to as a "life care" contract, the Residence Agreement referred to above basically obligates defendant to provide living accommodations and services to the resident. Included among the services provided are utilities, furnishings, three meals a day (including a special diet when ordered by a staff physician), linens, towels, medical and hospital care, general maintenance and parking. The understanding with respect to medical and hospital attention is stated in considerable detail. The facilities of a 90-bed medical center form a part of the community and are open to residents and nonresidents alike.
The resident's financial obligations are stated in paragraph three of the agreement and require payment of a "capital fee", which may range from $15,000 to $59,000, depending upon the size and type of living accommodations, and payment of such monthly charge "as may from time to time be determined to be necessary by the Corporation [defendant]". The agreement is silent as to any obligation of Homes to provide an accounting or explanation of rate increases.
Provision for termination of the agreement is contained in paragraph six and may be exercised with or without cause at any time by the resident or Homes upon 120 days written notice. If termination occurs by reason of the resident's death, no portion of the capital fee is refunded. If brought about by either party for any reason other than death the capital fee is refunded less a sum equal to 2% thereof multiplied by the *534 number of full calendar months between the date of occupancy under the contract and the effective date of termination. If the right of termination is exercised by Homes without good cause stated in the written notice, refund is made either in accordance with the foregoing computation or in an amount equal to 50% of the capital fee, whichever is more.
The Residence Agreement consists of 7 1/2 printed pages with 23 separate paragraphs, on 8 1/2" X 11" pages, and is prepared in nontechnical, understandable language. The paragraphs are numbered, easily read, and each is introduced by a statement of its subject matter in large black print.
Occupancy of the apartments is limited to persons of the age of 60 or over. In 1965, when plaintiff Onderdonk signed his Residence Agreement, all but one of the residents was over age 75, and when the case was tried in the Chancery Division in June 1977 the average age of the class members was more than 80. Over half were former schoolteachers or housewives, and 60% of the class had average annual incomes of $5,000 or less.
In August 1974, when suit was instituted, Meadow Lakes was occupied by 376 residents. All were given notice of their right to elect to be excluded from the class represented by plaintiffs and 121 residents exercised that option. Since that time the composition of the class and the group of residents who elected to be excluded therefrom has been altered by deaths or departures from Meadow Lakes so that at the time of trial 192 residents still remained in the class and 98 remained of those who elected to be excluded.
The critical facts on which this inquiry focuses are those surrounding the experience of plaintiff Paul Onderdonk. He is a retired engineer who, along with his wife, executed a Residence Agreement on November 29, 1965 and took occupancy in February 1967. He paid a capital fee of $25,000 and agreed to make monthly payments of $430 with the understanding recited in the agreement, as we noted above, that this payment could be *535 made in "such larger or smaller amount per month as may from time to time be determined to be necessary by the Corporation." On December 18, 1966 Onderdonk wrote to Homes about his concern over a monthly rate increase of 18% which occurred after he entered the contract but before he took occupancy. Under date of December 29, 1966 defendant's executive director replied as follows.
Dear Mr. Onderdonk:
We have received your letter concerning the increase in the monthly fee at Meadow Lakes effective January 1, 1967.
The service charge increase for the year of 1967 has actually taken in our operational expenses for 1965 and 1966 as well as a general increase in operating costs from back in 1962 when we originally planned Meadow Lakes. There will never be a time when there will be an 18% increase in rates. It is our hope that in any given year we will not have an increase of more than 5 to 10%. If you want to look back from the time we projected our original fees in 1962, you will find that the percentage of increase is 18% or approximately 3 1/2% per year. Now a person living outside no doubt experienced over a period of five years this same cost of living increase. We recognize with you that the increase this year is substantial. You can be assured that it will not be repeated again at such an amount.
We are working on some form of assurance to our residents regarding future rate increases that will eliminate much disillusionment and future anxiety. I am most aware that continuing yearly increases similar to the one for 1967 could create many hardships.
We look forward to your becoming a resident in our Meadow Lakes community. We feel that we have one of the best retirement areas with the proper emphasis. We are interested in people and the problems of retired people including the problem of the fixed retirement income. I can assure you that we will do our best to control costs and, in turn, the cost of living increases in the future.
This controversy centers principally on the fact that Mr. Onderdonk's monthly payment rate rose from $430 when he signed the agreement in 1965 to $1,232 in August 1974 when suit was filed and to $1,335 by the time of trial in June 1977. Despite the sprawling content of the record before us plaintiffs' appeal essentially rests on two contentions. The first is that the *536 relationship between plaintiffs and defendant is sufficiently fiduciary in character as to imply a right on the part of plaintiffs to receive court approved accountings on a regular basis. The other is that plaintiffs are entitled to the recovery of damages equal to the amount of expenses which they say were wrongly charged to the Meadow Lakes facility, thereby contributing to the inflated monthly rate. These expenses consist of certain start-up costs for other residential facilities and that part of mortgage interest which was paid out of Meadow Lakes capital fees but which, it is claimed, should have been paid out of revenue directly realized by the medical center from patients who were not residents of Meadow Lakes.
The first prerequisite for an order to account "at regular intervals", as plaintiffs request, is that there be a fiduciary or trust relationship. Kenilworth Borough v. Graceland Memorial Park Ass'n, 124 N.J. Eq. 35, 37 (Ch. 1938); Burdick v. Grimshaw, 113 N.J. Eq. 591, 602-603 (Ch. 1933); Bellingham v. Palmer, 54 N.J. Eq. 136 (Ch. 1895). The question of whether a trust has been created turns upon the intent expressed by the parties. Kronisch v. Howard Savings Institution, 161 N.J. Super. 592, 595-96 (App.Div. 1978). Notwithstanding plaintiffs' argument to the contrary, the trial judge found that neither basis for an accounting had been shown, a finding which is supported by substantial credible evidence. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484 (1974). And see Grow v. Indiana Retired Teachers Community, 149 Ind. App. 109, 271 N.E.2d 140, 144 (App.Ct. 1971), holding that "life care" contracts themselves do not give rise to a fiduciary contract.
In urging us to reverse the action below plaintiffs in effect ask that we modify the terms of the Residence Agreement to reduce the possibility of oppression and insure that Homes may use its advantageous position only in accordance with principles of good faith and fair dealing. We note first our satisfaction, from the trial judge's findings, that Homes has not behaved oppressively toward plaintiffs. Although the monthly rates *537 have experienced a remarkable rise over the years, nothing suggests that this was the product of anything other than good faith business decisions which were made necessary by difficult economic conditions. During three years of pretrial discovery proceedings plaintiffs have had complete access to the financial data upon which the monthly rate increases were based. The only claim arising therefrom has to do with the allocation to Meadow Lakes of expenses which plaintiffs say should be borne by Homes' other operating entities, an issue with which we will shortly deal. Furthermore, as the trial judge found in his written opinion
... even though the contract did not require an accounting, the testimony clearly demonstrates that Homes supplied accounting information to the plaintiffs over the years up to 1971 and that thereafter Homes offered to make this information available and to answer any questions posed by the residents, it agreed to supply the Advisory Council (which included residents as members) with copies of financial statements furnished to the mortgagee and it offered to open up all its books and records to any accountant hired by the plaintiffs. The Court finds from the testimony that the defendants exhibited a sincere desire to cooperate with the residents but that the executive committee of the Forum [the residents' representative association] displayed no such willingness to cooperate.
Equally important, it is the function of courts not to make contracts but to enforce them and give effect to the intention of the parties as of the time the contract was made. Courts are not free "to make a better contract for a party than that which he has voluntarily entered into or alter it for his benefit to the detriment of the other party." Moscovitz v. Middlesex Borough Bldg. & Loan Ass'n, 14 N.J. Super. 515, 521 (Law Div. 1951), aff'd 18 N.J. Super. 182, 186 (App.Div. 1952). Merely because a contract may be unfair is not a sufficient reason to render it voidable. De Caro v. De Caro, 22 N.J. Super. 463, 467 (App.Div. 1952), aff'd 13 N.J. 36 (1953). And in the absence of fraud, even where one fails to read his written contract before signing it, its provisions are nevertheless binding. Moreira Constr. Co. Inc. v. Moretrench Corp., 97 N.J. Super. *538 391, 394 (App.Div. 1967), aff'd o.b. 51 N.J. 405 (1968). We discern no reason why the Residence Agreement before us should form an exception to the foregoing rules ordinarily applied. Compare, Podkowicz v. Slowinski, 44 N.J. Super. 149, 156-158 (App.Div.), certif. den. 25 N.J. 43 (1957).
The contract in question clearly defines the rights and obligations of the parties. It does not appear that plaintiffs lacked a full appreciation of the terms to which they assented, and it is not suggested that they were the victims of fraud, imposition, coercion or any other form of overreaching. As plaintiff Onderdonk said in his letter of December 18, 1966 to defendant, written before he took occupancy, he recognized "that there was an open-end provision in it permitting adjustment of the monthly fee." Although, as he added, he never anticipated the "drastic adjustments" which were made, the language of the pertinent provision fairly apprised him of this possibility. The increase in monthly rates is, of course, very substantial. But we cannot disregard the fact that this occurred during a period of extraordinary inflation and to an appreciable degree reflects an escalation in the cost of medical and hospital services which naturally affects the elderly with particular severity. In 1977 medical charges consumed almost 35% of Mr. Onderdonk's entire monthly payment.
Notwithstanding the potential for abuse inherent in defendant's unregulated right to fix monthly charges and, for that matter, in other provisions of this contract, our attention, in summary, is chiefly held by the facts that it was entered into freely and understandingly, does not oblige defendant to account, and has not been exploited for any wrongful purpose. Although plaintiffs invoke the equitable jurisdiction in aid of their cause they have not demonstrated why the powers of equity should be used to write into a contract provisions which the parties themselves omitted or to modify terms to which they agreed, particularly where no overreaching has been shown.

*539 The rights of the parties are the same in equity as at law. Courts of equity may not "depart from all precedent and assume an unregulated power of administering abstract justice at the expense of well-settled principles." Heine v. The Board of Levee Commissioners, 19 Wall. 655, 22 L.Ed. 223 (1873). Equity has no jurisdiction over that "large class of obligations called imperfect obligations, resting upon conscience and moral duty only, unconnected with legal obligations. * * * Generally its jurisdiction depends upon legal obligations, and its decrees can only enforce remedies to the extent and in the mode by law established." Rees v. Watertown, 19 Wall. 107, 22 L.Ed. 72 (1873). It was pointed out in the latter case that the "great advantage" possessed by the Court of Chancery "is not so much in its enlarged jurisdiction as in the extent and adaptability of its remedial powers," and that "Generally its jurisdiction is as well defined and limited as is that of a court of law." See, also, Goerke Kirch Co. v. Goerke Kirch Holding Co., supra. [App. & Err. 1934, 118 N.J. Eq. 1, 176 A. 2d 902] Judge Story points out cases of fraud, of accident, and of trust which neither courts of law nor of equity presume to relieve or to mitigate. 1 Story's Eq. Jur. sec. 61 [Temple v. Clinton Trust Co., 1 N.J. 219, 227-228 (1948)]
Other states have met the many problems presented by "lifecare" community contracts through the enactment of regulatory legislation. See Ariz. Rev. Stat. Ann. §§ 20-1801 to 1811 (Supp. 1978); Cal.Health and Safety Code §§ 1770-1789.5 (West 1979); Colo. Rev. Stat. §§ 12-13-101 to -117 (Supp. 1978); Fla. Stat. Ann. §§ 651.011-651.12 (West Supp. 1979); Mich. Comp. Laws §§ 554.801-554.844 (Mich. Stat. Ann. §§ 14.1301(1)-(44) Callaghan (Supp. 1979)). Our examination of their complex interrelated provisions convinces us that the necessary balance between the needs and responsibilities of elderly residents and the management of a retirement community can best be achieved by a comprehensive legislative program, and not by ad hoc court remedies which effectually restructure the parties' agreement. See Helmsley v. Fort Lee, 78 N.J. 200, 243 (1978), app. dism. for want of a substantial federal question, 440 U.S. 978, 99 S.Ct. 1782, 60 L.Ed.2d 237 (1979).
Although we affirm the Chancery Division's denial of plaintiffs' application for court approved accountings at regular intervals, nothing that we have said is intended to preclude *540 plaintiffs from seeking an accounting upon the occasion of any future increases in monthly rates, based upon the particular facts and circumstances then prevailing and the equities arising therefrom, if the financial information voluntarily furnished and made available by Homes does not answer their requirements.
Plaintiffs' contention that mortgage interest expenses which were supposed to have been paid out of proceeds received by the medical center from nonresidents were improperly taken from capital fees is answered by the findings and conclusions of the trial judge which are supported by substantial credible evidence. State v. Johnson, 42 N.J. 146, 162 (1964). The medical center at Meadow Lakes was conceived as a self-supporting enterprise, providing medical services to both residents and nonresidents of Meadow Lakes. It was originally expected, although forming no part of the agreement with the residents, that based on anticipated revenues it would pay between $130,000 and $140,000 annually as its allocated share of interest payments on a mortgage loan by the Travelers Insurance Company. This would have amounted to between 19 and 20% of the total interest expense, the balance to be paid out of the "plant fund" derived from capital fees. However, it eventuated that the medical center paid only $118,529, or 4.2% of the total interest expense over the period between 1971 through 1974.
Plaintiffs' claim that the medical center's share of expenses were paid from Meadow Lakes capital fees and that they should, accordingly, be reimbursed for such payments. The argument overlooks the trial judge's finding that during the years in question, because of a federal price freeze, the medical rate charged patients at the medical center could not be increased and the center's revenue was therefore insufficient to meet all its obligations. Accordingly, Travelers Insurance Company, the mortgagee, agreed to forebear collection of the required payments, and no such payments were ever made. Hence, even assuming plaintiffs' right to challenge defendant's authority to *541 determine the use to which capital fees would be put, it is clear that they were not applied to the questioned purpose. Furthermore, as the trial judge pointed out, had the federal price freeze not been in effect during these years the increase in medical charges at the center which would have been necessary to make the budgeted mortgage interest payments would have applied both to nonresidents and residents alike with the result that plaintiffs' monthly charges, out of which a fixed percentage was allocated for the medical center, would have been even higher than they actually were.
Plaintiffs' other claim regarding improper allocation of expenses pertains to the cost of executive staff time. In addition to Meadow Lakes, Homes also operates other residential projects. Although this is done through separate corporate entities, they are controlled by common directorships and managed by a single executive office staff. Plaintiffs contend that certain services rendered by the staff in starting up other developments were wrongly charged to Meadow Lakes, resulting in a higher monthly rate for the residents of that facility, and they seek restoration of such charges for the benefit of Meadow Lakes residents. The amount claimed totals $39,868 for the period between 1971-1974, translating into a net monthly cost per resident of less than $2 a month.
The trial judge found that there had been such staff activity related to other facilities, but that it was "minimal and preliminary", and that except for $26,403, which was actually charged to a new facility being developed, executive office expenses were ordinarily allocated among those facilities which, like Meadow Lakes, were actually receiving rental income. While we are satisfied that the Meadow Lakes monthly rate "determined to be necessary" by Homes was never intended by the parties to reflect expenses incurred elsewhere than in connection with the operation of Meadow Lakes, the findings below preclude allowance of the damages sought by plaintiffs. The judge specifically noted that plaintiffs' claim rests only on budgeted allocations of executive office time, that these were nothing *542 more than management's best estimate of anticipated expenses for each facility, and clearly stated that plaintiffs had failed to prove how much of the budgeted expenses were actually incurred. Although plaintiffs dispute the soundness of this finding, it is based on substantial credible evidence and will not be disturbed. Rova Farms Resort v. Investors Ins. Co., supra.
Finally, we deal with defendants' appeal from the judgment for $2,500 in favor of plaintiff Onderdonk as damages "for emotional or mental distress" under the Landlord and Tenant Reprisal Law, N.J.S.A. 2A:42-10.10. Damages were awarded on the finding that Homes had served Onderdonk with a 120 day notice of termination of his Residence Agreement as a reprisal for his activities on behalf of a residents' organization. Homes maintained that the termination notice was for good cause, but the trial judge found otherwise and Homes does not pursue that aspect of the matter any further.
We have elsewhere held that Homes' Residence Agreement is not a lease and that the relationship thereby formed is not one of landlord and tenant. American Nat'l Bank & Trust Co. v. Presbyterian Homes, supra, 148 N.J. Super. at 473-74. The remedy made available by the Reprisal Law and allowed in Pohlman v. Metropolitan Trailer, 126 N.J. Super. 114 (Ch.Div. 1973), is therefore not available. Furthermore, and without addressing ourselves to the question of whether a termination notice served for reprisal purposes under the Residence Agreement can under any circumstances constitute an actionable wrong, we conclude that where, as here, there has been no proof of actual damage, a money judgment based thereon cannot be sustained.
To the extent that it awards damages in the sum of $2,500 to plaintiffs, the judgment is reversed. In all other respects it is affirmed.
NOTES
[1] Homes is a nonprofit corporation which has among its purposes that of providing housing for aged persons. The nature of its services and its organizational structure are extensively treated in Presbyterian Homes v. Tax Appeals Div., 55 N.J. 275 (1970), and American Nat'l Bank & Trust v. Presbyterian Homes, 148 N.J. Super. 465 (App.Div. 1977).