**In the Matter of CONSOLIDATED PIER DELIVERIES, INC., Debtor.**

**Bankruptcy No. 83–05969.**

United States Bankruptcy Court,
D. New Jersey.

Feb. 15, 1985.

**524**

James Dugan, Dugan, Hughes, Finnerty & Krause, Bayonne, N.J., for debtor.

Kathleen Miko, Dept. of Justice, Washington, D.C., Paul Dillon, Newark, N.J., appearing for W. Hunt Dumont, U.S. Atty. for N.J., for U.S.A.

Peter Sarasohn, Ravin, Sarasohn, Cook, Baumgarten & Fisch, West Orange, N.J., for ABJM Corp.

## OPINION

D. JOSEPH DE VITO, Bankruptcy Judge.

The case at bar brings to this Court a complicated fact situation calling, *inter alia,* for a determination (1) whether the lease in suit dated January 29, 1981 between the debtor Consolidated Pier Deliveries, Inc. (CPD) and the Department of the Army was effectively terminated prior to the filing of a Chapter 11 petition for reorganization, and (2) whether cause exists for vacating the automatic stay under § 362[a] of the Bankruptcy Code. In an earlier proceeding, the Court addressed the motion of the United States for an order modifying the automatic stay of § 362[a] to allow the government to take possession of certain real property which it had leased to CPD. In addition, the government sought payment from funds held as security for various lease obligations.

Following a hearing, the Court, in its opinion dated April 18, 1984, determined that questions relating to the termination of the lease, applicability of the Federal Anti-Assignment Act, 41 U.S.C. § 15, the assumability of the lease, and the issue of whether the stay should be lifted to permit the government to obtain possession of subject premises were deferred pending a further hearing to permit the introduction of additional evidence relating to the alleged lease violations and debtor's discussions with the government subsequent to receipt of the cure notice, all essential to the determination of the issues now considered. The findings of fact and conclusions of law contained in the Court's opinion of April 18, 1984 are herein incorporated by reference.

Paragraph 36 of the lease in suit requires that CPD (1) install utility meters, and (2) reimburse the Military Ocean Terminal, Bayonne, New Jersey (MOTBY) for all utilities consumed, as required by Paragraph 17. Paragraph 36 fixes a 60-day time limitation for installation of the metering devices, but further provides in the very next sentence that, in the event such installation cannot be accomplished, the Installation Commander MOTBY shall be advised so that appropriate alternate action may be taken. It thus appears that if CPD was unable to install the utility meters within sixty days after commencement of the lease, it had the duty of so advising the government to permit the latter to take appropriate alternate action. The lease does not specify what forms such appropriate alternate action may assume. Presumably, one such possibility covered by Paragraph 36 for the period prior to the installation of the meters would encompass basing utility charges on engineering estimates arrived at jointly by the MOTBY facility's engineer and CPD, and covered under a separate agreement between the Installation Commander and CPD. Paragraph 17 places ultimate responsibility for a determination of the cost to be paid by the lessee for utilities consumption with the officer having immediate jurisdiction over the property, and further provides that the government shall be under no obligation to furnish utility or other services.

In addition to the alleged violations of paragraphs 17 and 36, the July 19, 1983 notice to cure mailed by the Army Corps of Engineers also alleges violation of paragraph 4, requiring CPD to maintain the

demised premises in good order and condition.

In light of this Court's expressed concern with the materiality *vel non* of the above stated lease violations and the centrality of such provisions to the aforementioned lease in suit, Robert J. Salisbury, an official with the United States Corps of Engineers, Real Estate Division, was called by the government at the hearing of October 5, 1984 to testify as to the circumstances surrounding the July 19, 1983 cure notice, the preparation of which Mr. Salisbury supervised, and its upshot, the notice of termination of August 2, 1983 per paragraph 50 of the lease in suit, terminating the subject lease effective immediately. Mr. Salisbury's testimony embraced the chronology of events extending from the commencement of the lease on February 1, 1981 to the notice of termination of August 2, 1983. Mr. Salisbury was not himself a representative of MOTBY and, apart from the meeting of August 1, 1983 with Anthony Gallagher, Manager of Project Development for CPD, about which more later, had only a vague recollection of his participation in conversations with representatives of the debtor, Anthony Gallagher, and Robert Dunlap, president of CPD. Though Mr. Salisbury never took part himself in any discussions relative to installation of the utility meters between representatives of MOTBY and the debtor, he was able to identify a continual stream of correspondence to the debtor, reviewed if not authorized by him, in connection with the problem of installation of the meters. See transcript of October 5, 1984, pages 24–26.

It appears that one reason why the installation of utility meters was necessary was to enable the government to make an accurate determination of costs to be charged to CPD, based upon usage. It is incontrovertible, not only that the utility meters were never installed, either by the government or by the debtor, as required pursuant to paragraph 36 as aforementioned, but that the government, for more than a year, continued to impress upon the debtor via correspondence and in discussions the necessity for installation of the utility meters, all to no avail, ultimately resulting in the notice of termination as aforementioned. Though unclear as to the substance of the conversations between the principals of the debtor and the representatives of MOTBY, Mr. Salisbury was insistent regarding the continual complaints from MOTBY to his office on account of the debtor's protracted failure to install the utility meters.

■ The Court wishes to underscore that of significant relevance to its determination respecting the alleged lease violation for failure to install utility meters is the period of time encompassed in the government's demands for such installation. Although paragraph 36, as hereinbefore recited, calls for installation within sixty days after commencement of the lease, the debtor, in point of fact, was repeatedly pressed and reminded by the government of the necessity to install the meters for well over two years prior to the August 2, 1983 notice of termination. The Court holds that such failure was in and of itself sufficient material breach to warrant termination of the lease, and that the lease was, in fact, effectively terminated pursuant to paragraph 50 thereof by the government on August 2, 1983.

The debtor's efforts to show that there may have been a waiver with respect to the government's rights under paragraph 36 are simply unavailing. *First,* because paragraph 54[c] itself provides that the failure of the United States to insist in any one or more instances upon complete performance of any of the said conditions shall not be construed as a waiver or a relinquishment of the future performance of any such conditions, but the obligations of the lessee with respect to such future performance shall continue in full force and effect. *Second,* because the government was more than generous in the amount of time granted to the debtor for installation of the meters; *third,* because the meeting of August 1, 1983 with Mr. Gallagher, held at the latter's request and apparently lasting only a very short while, simply confirmed the

course of action already decided upon and in the process even then of being undertaken and executed by the government, namely, lease termination; and, *fourth*, because the time to cure set forth in the notice to cure of July 19, 1983 had already elapsed. See transcript of October 5, 1984, pages 51 to 52 and 63 to 64.

The testimony of Warren Gordon, Chief of Real Estate Division, U.S. Army Division North Atlantic, who works for the United States Army Corps of Engineers, underscores his intention to seek and obtain authorization from Washington to terminate the lease in suit based upon MOTBY's recurring complaints, memorialized in a succession of letters issued monthly between the Army Corps of Engineers, CPD and MOTBY over a period of many months prior to preparation of the notice of termination relating to (1) debtor's failure to install the utility meters, and (2) debtor's default with regard to its utility bills. At the aforementioned August 1st meeting, Gordon explicitly advised Gallagher that the lease would be terminated on account of CPD's "acts in lease violations and failure to comply with the terms of the lease over a period of time," and that there was nothing either Gallagher or Gordon could do about it. See transcript of October 5, 1984, pages 63 to 64 and 67. In fact, the meters have yet to be installed by the debtor.

Counsel for the debtor, joined by counsel for the trustee, argues that there was no effective termination of the lease because the debtor was not in breach, and, if it was in breach, the government should have elected some other remedy. The difficulty with that argument is that it is contradicted by the facts: *first*, because the meters were never installed, though it was the debtor's obligation under the lease to do so pursuant to paragraph 36; and *second*, because the debtor has not come forward with a plausible explanation of why they could not be installed. Just as N.J.S.A. 12A:1–203 imposes in commercial transactions an obligation of good faith in the performance and enforcement of all agreements or duties, so also this Court, applying by analogy the principle involved, has sought some sign or indication that CPD made at least a good faith effort to comply with the utility meters installation requirement. This Court has not discerned any such good faith effort to carry out the provisions of paragraph 36. Most telling in this regard is the lapse of many months before CPD bestirred itself to offer an excuse for its non-compliance, though the lease prescribes a sixty-day time limitation for installment. The letter of October 14, 1982 from Robert Dunlap, president of the debtor, to Warren Gordon, referred to in the transcript of October 5, 1984, pages 73 to 79, reciting the prohibitive expense involved, leaky steam pipes and other problems, does not, in the opinion of this Court, constitute an excuse for non-performance and comes more than a year and a half after such performance was required to be completed pursuant to paragraph 36. Therefore, notwithstanding the ambiguity contained in the second sentence of paragraph 36 relating to "appropriate alternate action", this Court finds that the debtor's protracted non-compliance, despite repeated warnings, evidences a lack of good faith with relation to its lease obligation to install utility meters, warranting termination.

Debtor's counsel argues that the government could have shut off the steam or installed the meters itself and assessed the security deposit of $560,000 held in the escrow account. However, paragraph 50 plainly provides that the government shall have the right to terminate the lease at any time by giving ten days written notice to the lessee in the event the lessee violates any of the terms and conditions of the lease, and continues and persists therein for ten days after notice thereof. That is the remedy elected by the government after more than two and a half years of persistent efforts to have CPD install the meters. It is a fundamental principle of statutory (or contract or lease) construction that a reasonable interpretation of a statute (or contract or lease) is to be preferred to an unreasonable one. 2A Sutherland

*Statutory Construction* (4th Ed.1973) Section 45.12 page 37. It is absurd to suppose that, because the government provided in paragraph 17 that it shall be under no obligation to furnish utilities or services, it therefore waived its right to insist upon installation of utility meters for payment by the lessee of its utilities charges.

Paragraph 17 provides that the lessee shall pay the cost of producing and/or supplying any utilities for the use of the lessee, and that such cost is to be determined by the officer having immediate jurisdiction over the property. The very next sentence contains the caveat that the government shall be under no obligation to furnish utilities. It appears, therefore, that, though pursuant to paragraph 17 the lessee has the responsibility of paying the cost of producing and/or supplying any utilities, the government does not have the obligation to furnish same. The final sentence of paragraph 17 states that payment shall be made in the method prescribed by the officer having immediate jurisdiction over the property, upon bills rendered monthly. That sentence suggests that whether the lessee reimburses the government the cost of producing and/or supplying utilities, or whether the lessee negotiates directly with the utility company concerning the cost of producing and/or supplying utilities, the method of payment is left to the determination of the officer having immediate jurisdiction over the property and, therefore, by necessary inference, the determination whether the government shall in fact furnish utilities or services rests with the government.

As previously noted, paragraph 36 provides in the first sentence thereof for the installation of utility meters. The language employed is the mandatory "shall", as opposed to the permissive "may". Referencing paragraph 17, that sentence further recites that, in accordance with condition 17 above, the lessee shall reimburse MOTBY for all utilities consumed. Clearly, that sentence at least contemplates payment by MOTBY in the first instance of the cost of producing and/or supplying utilities and reimbursement of same by the lessee.

The next sentence provides that the metering devices shall be installed by the lessee at its own cost and expense within sixty (60) days after commencement .of this lease. Inasmuch as the commencement date of the lease was February 1, 1981, the sixtieth day, which pursuant to said provision would be the last day for the installation, would obviously be April 2, 1981. Strictly speaking, April 2, 1981 marked the last day in which metering devices were permitted to be installed under the lease. However, the very next sentence introduces the following ambiguity. In the event that such installation cannot be accomplished, the Installation Commander MOTBY shall be advised, so that appropriate alternate action may be taken. It is possible to read such language as permitting installation outside the prescribed sixty-day period, or even as waiving the requirement of installation altogether in the event such installation could not be accomplished. The fact that the Installation Commander MOTBY is required to be advised that the installation cannot be accomplished implies that the lessee is charged under the lease with the responsibility for making such determination, in order that the Installation Commander MOTBY may then take appropriate alternate action. Though the language "appropriate alternate action" is nowhere further clarified or elaborated upon in the lease, clearly the responsibility for such action rests with MOTBY, and the question here is whether, in the exercise of such responsibility, MOTBY has the right to insist upon strict compliance with the meters installation requirement. That question in turn would appear to depend upon such factors as the good faith, or lack thereof, of the lessee's representation that the installation of the utility meters cannot be accomplished, the time periods involved, the history of the respective parties' dealings and course of performance under the lease, the reaction of the government to CPD's failure to install the utility meters during the life of the lease, the consequences to the lessor of lessee's failure to install the meters, les-

see's defenses, if any, and the alternatives available to the government in response to such failure and the government's long delay of over two years in issuing the notice to cure and notice of termination, and the good faith of the government in terms of the reasons set forth therein. The rest of paragraph 36 relates to the specifics of access to and arrangements for the installation and maintenance of the meters. Significantly, paragraph 36 also provides a method for the determination of utilities charges based on engineering estimates arrived at jointly by the MOTBY facilities engineer and the lessee, and covered under a separate agreement between the Installation Commander and the lessee during the pre-utility meters' installation. Clearly, the specifics of paragraph 36 contradict the general disclaimer contained in paragraph 17 relating to the government's lack of obligation to furnish utilities or services. At least during the sixty-day or pre-installation period, the government did in fact, under paragraph 36, assume responsibility for furnishing utilities, or else the joint method of estimating utilities charges provided for therein would have made no sense. It is equally clear, however, that the government did not intend this arrangement to continue indefinitely; hence, the requirement that utility meters be installed by the lessee at its own cost and expense within sixty days after commencement of the lease.

In accordance with the basic principle of construction that the general yields to the specific, *Standard Oil Development Company Employees Union v. Esso Research & Engineering Company*, 38 N.J.Super. 106, 117, 118 A.2d 70 (App.Div.1955), *opinion adhered to*, 38 N.J.Super. 293, 296, 118 A.2d 712 (App.Div.1955); *George M. Brewster & Son v. Catalytic Construction Company*, 17 N.J. 20, 35, 109 A.2d 805 (1954), this Court regards the specifics of paragraph 36, insofar as they relate to the installation, method of calibration, and maintenance of the utility meters, as binding upon the parties. The Court further feels the government's generic disclaimer of any obligation to furnish utilities or ser-

vices is in the nature merely of a hold harmless clause, and does not exculpate the lessee from its obligation to install the meters.

Seen from this perspective, the decision of the government to come down hard on CPD and terminate its lease on August 2, 1983, upon CPD's failure to cure pursuant to the notice to cure of July 19, 1983, was a proper exercise of the government's termination rights under subdivision C of paragraph 50 of the lease. This Court would not be justified at law or in equity in remaking the agreement to achieve a more equitable result or more desirable bargain than that agreed to by the parties. *Matter of Community Medical Center*, 623 F.2d 864 (3d Cir.1980); *Nation Wide, Inc. v. Scullin*, 256 F.Supp. 929 (D.N.J.1966) *aff'd.* 377 F.2d 554; *Robert L. Ferman & Company v. General Magnaplate Corp.*, 33 F.R.D. 326 (D.N.J.1963); *Onderdonk v. Presbyterian Homes of New Jersey, Inc.*, 171 N.J.Super. 529, 410 A.2d 252 (App.Div. 1979) *aff'd.* in part, *reversed* in part on other grounds, 85 N.J. 171, 425 A.2d 1057; *Brick Township Municipal Utilities Authority v. Diversified R.B. & T. Construction Company, Inc.*, 171 N.J.Super. 397, 409 A.2d 806 (App.Div.1979); *Hartford Fire Insurance Company v. Riefolo Construction Company, Inc.*, 161 N.J.Super. 99, 390 A.2d 1210 (App.Div.1978) *aff'd.* 81 N.J. 514, 410 A.2d 658; *Wells v. Wilbur B. Driver Company*, 121 N.J.Super. 185, 198, 296 A.2d 352 (Law Div.1972); *Drake v. Town of Boonton*, 106 N.J.Super. 79, 86, 254 A.2d 151 (Law Div.1969); *Standard Refinery Union, Inc. v. Esso Standard Oil Company*, 31 N.J.Super. 548, 107 A.2d 513 (App.Div.1954); J. Calamari and J. Perillo *Contracts* (2d Ed.1970) Section 9–31 to 36, pages 311–16.

As already noted, the gravity with which the government viewed CPD's persistent failure to install the utility meters provided for in the lease and the attendant difficulties in measuring consumption, resulting therefrom, is perhaps best exemplified by the repeated efforts reflected in the plethora of correspondence on a monthly, and

progressively more and more urgent basis commencing at least as far back as June of 1982 and continuing through June of 1983, encompassing government's Exhibits 1 through 12. These repeated and continual, albeit futile, efforts not only underscore the grievousness of the breach, but they predate and, therefore, belie the debtor's contention that the government now seeks removal because of alleged bad publicity concerning CPD in the print media. With respect to the two other grounds for termination set forth in the aforementioned notice to cure, this Court finds:

(1) That as of August 3, 1984, CPD's unpaid utilities consumption debt to the District Army Corps of Engineers was in the sum of $160,766.76 and that, in addition thereto, no utilities payments have been tendered to date; and

(2) That in violation of paragraph 4 of the lease, CPD failed to maintain the demised premises in good working order and condition, a fact abundantly supported by the testimony of MOTBY Fire Chief John Azevedo at the hearings of July 30, 1984 and August 3, 1984, and, further, that such conditions have only worsened since the filing.

Because of all of the foregoing, this Court finds that the lease in suit was effectively terminated on August 2, 1983, a day before the filing; there was no lease *in esse* to be assumed or rejected by the trustee pursuant to 11 U.S.C. § 365[a]. See this Court's opinion of April 18, 1984, *In re Consolidated Pier Deliveries, Inc.,* and cases cited therein.

The lease in suit never having been property of the estate, the legal effect of such a determination is to render the debtor a mere tenant by sufferance. Accordingly, cause exists to vacate the automatic stay pursuant to 11 U.S.C. § 362[d][1]. The government's motion for relief from the stay is granted. This ruling obviously moots consideration of the issue of adequate protection.

Submit an order in accordance with the above opinion.